(Slip Opinion) OCTOBER TERM, 2016 1

NOTE: Where it is feasible, a syllabus (headnote) will be released, as is being done in connection with this case, at the time the opinion is issued. The syllabus constitutes no part of the opinion of the Court but has been prepared by the Reporter of Decisions for the convenience of the reader. See *United States* v. *Detroit Timber & Lumber Co.,* 200 U. S. 321, 337.

# SUPREME COURT OF THE UNITED STATES

Syllabus

## TRINITY LUTHERAN CHURCH OF COLUMBIA, INC. *v.* COMER, DIRECTOR, MISSOURI DEPARTMENT OF NATURAL RESOURCES

### CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE EIGHTH CIRCUIT

No. 15–577. Argued April 19, 2017—Decided June 26, 2017

The Trinity Lutheran Church Child Learning Center is a Missouri preschool and daycare center. Originally established as a nonprofit organization, the Center later merged with Trinity Lutheran Church and now operates under its auspices on church property. Among the facilities at the Center is a playground, which has a coarse pea gravel surface beneath much of the play equipment. In 2012, the Center sought to replace a large portion of the pea gravel with a pour-in-place rubber surface by participating in Missouri's Scrap Tire Program. The program, run by the State's Department of Natural Resources, offers reimbursement grants to qualifying nonprofit organizations that install playground surfaces made from recycled tires. The Department had a strict and express policy of denying grants to any applicant owned or controlled by a church, sect, or other religious entity. Pursuant to that policy, the Department denied the Center's application. In a letter rejecting that application, the Department explained that under Article I, Section 7 of the Missouri Constitution, the Department could not provide financial assistance directly to a church. The Department ultimately awarded 14 grants as part of the 2012 program. Although the Center ranked fifth out of the 44 applicants, it did not receive a grant because it is a church.

Trinity Lutheran sued in Federal District Court, alleging that the Department's failure to approve its application violated the Free Exercise Clause of the First Amendment. The District Court dismissed the suit. The Free Exercise Clause, the court stated, prohibits the government from outlawing or restricting the exercise of a religious practice, but it generally does not prohibit withholding an affirmative

benefit on account of religion.  The District Court likened the case before it to *Locke* v. *Davey*, 540 U. S. 712, where this Court upheld against a free exercise challenge a State's decision not to fund degrees in devotional theology as part of a scholarship program.  The District Court held that the Free Exercise Clause did not require the State to make funds available under the Scrap Tire Program to Trinity Lutheran.  A divided panel of the Eighth Circuit affirmed.  The fact that the State could award a scrap tire grant to Trinity Lutheran without running afoul of the Establishment Clause of the Federal Constitution, the court ruled, did not mean that the Free Exercise Clause compelled the State to disregard the broader antiestablishment principle reflected in its own Constitution.

*Held*: The Department's policy violated the rights of Trinity Lutheran under the Free Exercise Clause of the First Amendment by denying the Church an otherwise available public benefit on account of its religious status.  Pp. 6–15.

   (a) This Court has repeatedly confirmed that denying a generally available benefit solely on account of religious identity imposes a penalty on the free exercise of religion.  Thus, in *McDaniel* v. *Paty*, 435 U. S. 618, the Court struck down a Tennessee statute disqualifying ministers from serving as delegates to the State's constitutional convention.  A plurality recognized that such a law discriminated against McDaniel by denying him a benefit solely because of his "*status* as a 'minister.'"  *Id.,* at 627.  In recent years, when rejecting free exercise challenges to neutral laws of general applicability, the Court has been careful to distinguish such laws from those that single out the religious for disfavored treatment.  See, *e.g.*, *Lyng* v. *Northwest Indian Cemetery Protective Assn.*, 485 U. S. 439; *Employment Div., Dept. of Human Resources of Ore.* v. *Smith*, 494 U. S. 872; and *Church of Lukumi Babalu Aye, Inc.* v. *Hialeah*, 508 U. S. 520.  It has remained a fundamental principle of this Court's free exercise jurisprudence that laws imposing "special disabilities on the basis of . . . religious status" trigger  the strictest scrutiny.  *Id.*, at 533.  Pp. 6–9.

   (b) The Department's policy expressly discriminates against otherwise eligible recipients by disqualifying them from a public benefit solely because of their religious character.  Like the disqualification statute in *McDaniel*, the Department's policy puts Trinity Lutheran to a choice: It may participate in an otherwise available benefit program or remain a religious institution.  When the State conditions a benefit in this way, *McDaniel* says plainly that the State has imposed a penalty on the free exercise of religion that must withstand the most exacting scrutiny.  435 U. S., at 626, 628.

   The Department contends that simply declining to allocate to Trinity Lutheran a subsidy the State had no obligation to provide does

not meaningfully burden the Church's free exercise rights. Absent any such burden, the argument continues, the Department is free to follow the State's antiestablishment objection to providing funds directly to a church. But, as even the Department acknowledges, the Free Exercise Clause protects against "indirect coercion or penalties on the free exercise of religion, not just outright prohibitions." *Lyng*, 485 U. S., at 450. Trinity Lutheran is not claiming any entitlement to a subsidy. It is asserting a right to participate in a government benefit program without having to disavow its religious character. The express discrimination against religious exercise here is not the denial of a grant, but rather the refusal to allow the Church—solely because it is a church—to compete with secular organizations for a grant. Pp. 9–11.

(c) The Department tries to sidestep this Court's precedents by arguing that this case is instead controlled by *Locke* v. *Davey*. It is not. In *Locke*, the State of Washington created a scholarship program to assist high-achieving students with the costs of postsecondary education. Scholarship recipients were free to use state funds at accredited religious and non-religious schools alike, but they could not use the funds to pursue a devotional theology degree. At the outset, the Court made clear that *Locke* was not like the cases in which the Court struck down laws requiring individuals to "choose between their religious beliefs and receiving a government benefit." 540 U. S., at 720–721. Davey was not denied a scholarship because of who he *was*; he was denied a scholarship because of what he proposed *to do*. Here there is no question that Trinity Lutheran was denied a grant simply because of what it is—a church.

The Court in *Locke* also stated that Washington's restriction on the use of its funds was in keeping with the State's antiestablishment interest in not using taxpayer funds to pay for the training of clergy, an "essentially religious endeavor," *id.*, at 721. Here, nothing of the sort can be said about a program to use recycled tires to resurface playgrounds. At any rate, the Court took account of Washington's antiestablishment interest only after determining that the scholarship program did not "require students to choose between their religious beliefs and receiving a government benefit." *Id.*, at 720–721. There is no dispute that Trinity Lutheran *is* put to the choice between being a church and receiving a government benefit. Pp. 11–14.

(d) The Department's discriminatory policy does not survive the "most rigorous" scrutiny that this Court applies to laws imposing special disabilities on account of religious status. *Lukumi*, 508 U. S., at 546. That standard demands a state interest "of the highest order" to justify the policy at issue. *McDaniel*, 435 U. S., at 628 (internal quotation marks omitted). Yet the Department offers nothing more

than Missouri's preference for skating as far as possible from religious establishment concerns.  In the face of the clear infringement on free exercise before the Court, that interest cannot qualify as compelling.  Pp. 14–15.

788 F. 3d 779, reversed and remanded.

ROBERTS, C. J., delivered the opinion of the Court, except as to footnote 3.  KENNEDY, ALITO, and KAGAN, JJ., joined that opinion in full, and THOMAS and GORSUCH, JJ., joined except as to footnote 3.  THOMAS, J., filed an opinion concurring in part, in which GORSUCH, J., joined.  GORSUCH, J., filed an opinion concurring in part, in which THOMAS, J., joined.  BREYER, J., filed an opinion concurring in the judgment.  SOTOMAYOR, J., filed a dissenting opinion, in which GINSBURG, J., joined.

NOTICE: This opinion is subject to formal revision before publication in the preliminary print of the United States Reports. Readers are requested to notify the Reporter of Decisions, Supreme Court of the United States, Washington, D. C. 20543, of any typographical or other formal errors, in order that corrections may be made before the preliminary print goes to press.

# SUPREME COURT OF THE UNITED STATES

No. 15–577

TRINITY LUTHERAN CHURCH OF COLUMBIA, INC., PETITIONER *v.* CAROL S. COMER, DIRECTOR, MISSOURI DEPARTMENT OF NATURAL RESOURCES

ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE EIGHTH CIRCUIT

[June 26, 2017]

CHIEF JUSTICE ROBERTS delivered the opinion of the Court, except as to footnote 3.

The Missouri Department of Natural Resources offers state grants to help public and private schools, nonprofit daycare centers, and other nonprofit entities purchase rubber playground surfaces made from recycled tires. Trinity Lutheran Church applied for such a grant for its preschool and daycare center and would have received one, but for the fact that Trinity Lutheran is a church. The Department had a policy of categorically disqualifying churches and other religious organizations from receiving grants under its playground resurfacing program. The question presented is whether the Department's policy violated the rights of Trinity Lutheran under the Free Exercise Clause of the First Amendment.

I

A

The Trinity Lutheran Church Child Learning Center is a preschool and daycare center open throughout the year

to serve working families in Boone County, Missouri, and the surrounding area. Established as a nonprofit organization in 1980, the Center merged with Trinity Lutheran Church in 1985 and operates under its auspices on church property. The Center admits students of any religion, and enrollment stands at about 90 children ranging from age two to five.

The Center includes a playground that is equipped with the basic playground essentials: slides, swings, jungle gyms, monkey bars, and sandboxes. Almost the entire surface beneath and surrounding the play equipment is coarse pea gravel. Youngsters, of course, often fall on the playground or tumble from the equipment. And when they do, the gravel can be unforgiving.

In 2012, the Center sought to replace a large portion of the pea gravel with a pour-in-place rubber surface by participating in Missouri's Scrap Tire Program. Run by the State's Department of Natural Resources to reduce the number of used tires destined for landfills and dump sites, the program offers reimbursement grants to qualifying nonprofit organizations that purchase playground surfaces made from recycled tires. It is funded through a fee imposed on the sale of new tires in the State.

Due to limited resources, the Department cannot offer grants to all applicants and so awards them on a competitive basis to those scoring highest based on several criteria, such as the poverty level of the population in the surrounding area and the applicant's plan to promote recycling. When the Center applied, the Department had a strict and express policy of denying grants to any applicant owned or controlled by a church, sect, or other religious entity. That policy, in the Department's view, was compelled by Article I, Section 7 of the Missouri Constitution, which provides:

"That no money shall ever be taken from the public

treasury, directly or indirectly, in aid of any church, sect or denomination of religion, or in aid of any priest, preacher, minister or teacher thereof, as such; and that no preference shall be given to nor any discrimination made against any church, sect or creed of religion, or any form of religious faith or worship."

In its application, the Center disclosed its status as a ministry of Trinity Lutheran Church and specified that the Center's mission was "to provide a safe, clean, and attractive school facility in conjunction with an educational program structured to allow a child to grow spiritually, physically, socially, and cognitively." App. to Pet. for Cert. 131a. After describing the playground and the safety hazards posed by its current surface, the Center detailed the anticipated benefits of the proposed project: increasing access to the playground for all children, including those with disabilities, by providing a surface compliant with the Americans with Disabilities Act of 1990; providing a safe, long-lasting, and resilient surface under the play areas; and improving Missouri's environment by putting recycled tires to positive use. The Center also noted that the benefits of a new surface would extend beyond its students to the local community, whose children often use the playground during non-school hours.

The Center ranked fifth among the 44 applicants in the 2012 Scrap Tire Program. But despite its high score, the Center was deemed categorically ineligible to receive a grant. In a letter rejecting the Center's application, the program director explained that, under Article I, Section 7 of the Missouri Constitution, the Department could not provide financial assistance directly to a church.

The Department ultimately awarded 14 grants as part of the 2012 program. Because the Center was operated by Trinity Lutheran Church, it did not receive a grant.

B

Trinity Lutheran sued the Director of the Department in Federal District Court. The Church alleged that the Department's failure to approve the Center's application, pursuant to its policy of denying grants to religiously affiliated applicants, violates the Free Exercise Clause of the First Amendment. Trinity Lutheran sought declaratory and injunctive relief prohibiting the Department from discriminating against the Church on that basis in future grant applications.

The District Court granted the Department's motion to dismiss. The Free Exercise Clause, the District Court stated, prohibits the government from outlawing or restricting the exercise of a religious practice; it generally does not prohibit withholding an affirmative benefit on account of religion. The District Court likened the Department's denial of the scrap tire grant to the situation this Court encountered in *Locke* v. *Davey*, 540 U. S. 712 (2004). In that case, we upheld against a free exercise challenge the State of Washington's decision not to fund degrees in devotional theology as part of a state scholarship program. Finding the present case "nearly indistinguishable from *Locke*," the District Court held that the Free Exercise Clause did not require the State to make funds available under the Scrap Tire Program to religious institutions like Trinity Lutheran. *Trinity Lutheran Church of Columbia, Inc.* v. *Pauley*, 976 F. Supp. 2d 1137, 1151 (WD Mo. 2013).

The Court of Appeals for the Eighth Circuit affirmed. The court recognized that it was "rather clear" that Missouri *could* award a scrap tire grant to Trinity Lutheran without running afoul of the Establishment Clause of the United States Constitution. *Trinity Lutheran Church of Columbia, Inc.* v. *Pauley*, 788 F. 3d 779, 784 (2015). But, the Court of Appeals explained, that did not mean the Free Exercise Clause compelled the State to disregard the

antiestablishment principle reflected in its own Constitution. Viewing a monetary grant to a religious institution as a "'hallmark[] of an established religion,'" the court concluded that the State could rely on an applicant's religious status to deny its application. *Id.*, at 785 (quoting *Locke*, 540 U. S., at 722; some internal quotation marks omitted).

Judge Gruender dissented. He distinguished *Locke* on the ground that it concerned the narrow issue of funding for the religious training of clergy, and "did not leave states with unfettered discretion to exclude the religious from generally available public benefits." 788 F. 3d, at 791 (opinion concurring in part and dissenting in part).

Rehearing en banc was denied by an equally divided court.

We granted certiorari *sub nom. Trinity Lutheran Church of Columbia, Inc.* v. *Pauley*, 577 U. S. ___ (2016), and now reverse.[1]

_____

[1] In April 2017, the Governor of Missouri announced that he had directed the Department to begin allowing religious organizations to compete for and receive Department grants on the same terms as secular organizations. That announcement does not moot this case. We have said that such voluntary cessation of a challenged practice does not moot a case unless "subsequent events ma[ke] it absolutely clear that the allegedly wrongful behavior could not reasonably be expected to recur." *Friends of the Earth, Inc.* v. *Laidlaw Environmental Services (TOC), Inc.*, 528 U. S. 167, 189 (2000) (internal quotation marks omitted). The Department has not carried the "heavy burden" of making "absolutely clear" that it could not revert to its policy of excluding religious organizations. *Ibid.* The parties agree. See Letter from James R. Layton, Counsel for Respondent, to Scott S. Harris, Clerk of Court (Apr. 18, 2017) (adopting the position of the Missouri Attorney General's Office that "there is no clearly effective barrier that would prevent the [Department] from reinstating [its] policy in the future"); Letter from David A. Cortman, Counsel for Petitioner, to Scott S. Harris, Clerk of Court (Apr. 18, 2017) ("[T]he policy change does nothing to remedy the source of the [Department's] original policy—the Missouri Supreme Court's interpretation of Article 1, §7 of the Missouri Constitution").

## II

The First Amendment provides, in part, that "Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof." The parties agree that the Establishment Clause of that Amendment does not prevent Missouri from including Trinity Lutheran in the Scrap Tire Program. That does not, however, answer the question under the Free Exercise Clause, because we have recognized that there is "play in the joints" between what the Establishment Clause permits and the Free Exercise Clause compels. *Locke*, 540 U. S., at 718 (internal quotation marks omitted).

The Free Exercise Clause "protect[s] religious observers against unequal treatment" and subjects to the strictest scrutiny laws that target the religious for "special disabilities" based on their "religious status." *Church of Lukumi Babalu Aye, Inc.* v. *Hialeah*, 508 U. S. 520, 533, 542 (1993) (internal quotation marks omitted). Applying that basic principle, this Court has repeatedly confirmed that denying a generally available benefit solely on account of religious identity imposes a penalty on the free exercise of religion that can be justified only by a state interest "of the highest order." *McDaniel* v. *Paty*, 435 U. S. 618, 628 (1978) (plurality opinion) (quoting *Wisconsin* v. *Yoder*, 406 U. S. 205, 215 (1972)).

In *Everson* v. *Board of Education of Ewing*, 330 U. S. 1 (1947), for example, we upheld against an Establishment Clause challenge a New Jersey law enabling a local school district to reimburse parents for the public transportation costs of sending their children to public and private schools, including parochial schools. In the course of ruling that the Establishment Clause allowed New Jersey to extend that public benefit to all its citizens regardless of their religious belief, we explained that a State "cannot hamper its citizens in the free exercise of their own religion. Consequently, it cannot exclude individual Catho-

lics, Lutherans, Mohammedans, Baptists, Jews, Methodists, Non-believers, Presbyterians, or the members of any other faith, *because of their faith, or lack of it*, from receiving the benefits of public welfare legislation." *Id.*, at 16.

Three decades later, in *McDaniel* v. *Paty*, the Court struck down under the Free Exercise Clause a Tennessee statute disqualifying ministers from serving as delegates to the State's constitutional convention. Writing for the plurality, Chief Justice Burger acknowledged that Tennessee had disqualified ministers from serving as legislators since the adoption of its first Constitution in 1796, and that a number of early States had also disqualified ministers from legislative office. This historical tradition, however, did not change the fact that the statute discriminated against McDaniel by denying him a benefit solely because of his "*status* as a 'minister.'" 435 U. S., at 627. McDaniel could not seek to participate in the convention while also maintaining his role as a minister; to pursue the one, he would have to give up the other. In this way, said Chief Justice Burger, the Tennessee law "effectively penalizes the free exercise of [McDaniel's] constitutional liberties." *Id.*, at 626 (quoting *Sherbert* v. *Verner*, 374 U. S. 398, 406 (1963); internal quotation marks omitted). Joined by Justice Marshall in concurrence, Justice Brennan added that "because the challenged provision requires [McDaniel] to purchase his right to engage in the ministry by sacrificing his candidacy it impairs the free exercise of his religion." *McDaniel*, 435 U. S., at 634.

In recent years, when this Court has rejected free exercise challenges, the laws in question have been neutral and generally applicable without regard to religion. We have been careful to distinguish such laws from those that single out the religious for disfavored treatment.

For example, in *Lyng* v. *Northwest Indian Cemetery Protective Association*, 485 U. S. 439 (1988), we held that the Free Exercise Clause did not prohibit the Government

from timber harvesting or road construction on a particu-
lar tract of federal land, even though the Government's
action would obstruct the religious practice of several
Native American Tribes that held certain sites on the tract
to be sacred.  Accepting that "[t]he building of a road or
the harvesting of timber . . . would interfere significantly
with private persons' ability to pursue spiritual fulfillment
according to their own religious beliefs," we nonetheless
found no free exercise violation, because the affected
individuals were not being "coerced by the Government's
action into violating their religious beliefs."  *Id.,* at 449.
The Court specifically noted, however, that the Govern-
ment action did not "penalize religious activity by denying
any person an equal share of the rights, benefits, and
privileges enjoyed by other citizens."  *Ibid.*

   In *Employment Division, Department of Human Re-
sources of Oregon* v. *Smith*, 494 U. S. 872 (1990), we re-
jected a free exercise claim brought by two members of a
Native American church denied unemployment benefits
because they had violated Oregon's drug laws by ingesting
peyote for sacramental purposes.  Along the same lines as
our decision in *Lyng*, we held that the Free Exercise
Clause did not entitle the church members to a special
dispensation from the general criminal laws on account of
their religion.  At the same time, we again made clear that
the Free Exercise Clause *did* guard against the govern-
ment's imposition of "special disabilities on the basis of
religious views or religious status."  494 U. S., at 877
(citing *McDaniel*, 435 U. S. 618).[2]

_____

   [2] This is not to say that any application of a valid and neutral law of
general applicability is necessarily constitutional under the Free
Exercise Clause.  Recently, in *Hosanna-Tabor Evangelical Lutheran
Church and School* v. *EEOC*, 565 U. S. 171 (2012), this Court held that
the Religion Clauses required a ministerial exception to the neutral
prohibition on employment retaliation contained in the Americans with
Disabilities Act.  Distinguishing *Smith*, we explained that while that

Finally, in *Church of Lukumi Babalu Aye, Inc.* v. *Hialeah*, we struck down three facially neutral city ordinances that outlawed certain forms of animal slaughter. Members of the Santeria religion challenged the ordinances under the Free Exercise Clause, alleging that despite their facial neutrality, the ordinances had a discriminatory purpose easy to ferret out: prohibiting sacrificial rituals integral to Santeria but distasteful to local residents. We agreed. Before explaining why the challenged ordinances were not, in fact, neutral or generally applicable, the Court recounted the fundamentals of our free exercise jurisprudence. A law, we said, may not discriminate against "some or all religious beliefs." 508 U. S., at 532. Nor may a law regulate or outlaw conduct because it is religiously motivated. And, citing *McDaniel* and *Smith*, we restated the now-familiar refrain: The Free Exercise Clause protects against laws that "'impose[] special disabilities on the basis of . . . religious status.'" 508 U. S., at 533 (quoting *Smith*, 494 U. S., at 877); see also *Mitchell* v. *Helms*, 530 U. S. 793, 828 (2000) (plurality opinion) (noting "our decisions that have prohibited governments from discriminating in the distribution of public benefits based upon religious status or sincerity" (citing *Rosenberger* v. *Rector and Visitors of Univ. of Va.*, 515 U. S. 819 (1995); *Lamb's Chapel* v. *Center Moriches Union Free School Dist.*, 508 U. S. 384 (1993); *Widmar* v. *Vincent*, 454 U. S. 263 (1981))).

### III

#### A

The Department's policy expressly discriminates against otherwise eligible recipients by disqualifying them from a

_____

case concerned government regulation of physical acts, "[t]he present case, in contrast, concerns government interference with an internal church decision that affects the faith and mission of the church itself." 565 U. S*.,* at 190.

public benefit solely because of their religious character.
If the cases just described make one thing clear, it is that
such a policy imposes a penalty on the free exercise of
religion that triggers the most exacting scrutiny. *Lukumi*,
508 U. S., at 546. This conclusion is unremarkable in light
of our prior decisions.

Like the disqualification statute in *McDaniel*, the De-
partment's policy puts Trinity Lutheran to a choice: It may
participate in an otherwise available benefit program or
remain a religious institution. Of course, Trinity Lu-
theran is free to continue operating as a church, just as
McDaniel was free to continue being a minister. But that
freedom comes at the cost of automatic and absolute ex-
clusion from the benefits of a public program for which the
Center is otherwise fully qualified. And when the State
conditions a benefit in this way, *McDaniel* says plainly
that the State has punished the free exercise of religion:
"To condition the availability of benefits . . . upon [a recip-
ient's] willingness to . . . surrender[] his religiously im-
pelled [status] effectively penalizes the free exercise of his
constitutional liberties." 435 U. S., at 626 (plurality opin-
ion) (alterations omitted).

The Department contends that merely declining to
extend funds to Trinity Lutheran does not *prohibit* the
Church from engaging in any religious conduct or other-
wise exercising its religious rights. In this sense, says the
Department, its policy is unlike the ordinances struck
down in *Lukumi*, which outlawed rituals central to San-
teria. Here the Department has simply declined to allo-
cate to Trinity Lutheran a subsidy the State had no obli-
gation to provide in the first place. That decision does not
meaningfully burden the Church's free exercise rights.
And absent any such burden, the argument continues, the
Department is free to heed the State's antiestablishment
objection to providing funds directly to a church. Brief for
Respondent 7–12, 14–16.

It is true the Department has not criminalized the way Trinity Lutheran worships or told the Church that it cannot subscribe to a certain view of the Gospel. But, as the Department itself acknowledges, the Free Exercise Clause protects against "indirect coercion or penalties on the free exercise of religion, not just outright prohibitions." *Lyng*, 485 U. S., at 450. As the Court put it more than 50 years ago, "[i]t is too late in the day to doubt that the liberties of religion and expression may be infringed by the denial of or placing of conditions upon a benefit or privilege." *Sherbert*, 374 U. S., at 404; see also *McDaniel*, 435 U. S., at 633 (Brennan, J., concurring in judgment) (The "proposition—that the law does not interfere with free exercise because it does not directly prohibit religious activity, but merely conditions eligibility for office on its abandonment—is . . . squarely rejected by precedent").

Trinity Lutheran is not claiming any entitlement to a subsidy. It instead asserts a right to participate in a government benefit program without having to disavow its religious character. The "imposition of such a condition upon even a gratuitous benefit inevitably deter[s] or discourage[s] the exercise of First Amendment rights." *Sherbert*, 374 U. S., at 405. The express discrimination against religious exercise here is not the denial of a grant, but rather the refusal to allow the Church—solely because it is a church—to compete with secular organizations for a grant. Cf. *Northeastern Fla. Chapter, Associated Gen. Contractors of America* v. *Jacksonville*, 508 U. S. 656, 666 (1993) ("[T]he 'injury in fact' is the inability to compete on an equal footing in the bidding process, not the loss of a contract"). Trinity Lutheran is a member of the community too, and the State's decision to exclude it for purposes of this public program must withstand the strictest scrutiny.

B

The Department attempts to get out from under the

weight of our precedents by arguing that the free exercise question in this case is instead controlled by our decision in *Locke* v. *Davey*. It is not. In *Locke*, the State of Washington created a scholarship program to assist high-achieving students with the costs of postsecondary education. The scholarships were paid out of the State's general fund, and eligibility was based on criteria such as an applicant's score on college admission tests and family income. While scholarship recipients were free to use the money at accredited religious and non-religious schools alike, they were not permitted to use the funds to pursue a devotional theology degree—one "devotional in nature or designed to induce religious faith." 540 U. S., at 716 (internal quotation marks omitted). Davey was selected for a scholarship but was denied the funds when he refused to certify that he would not use them toward a devotional degree. He sued, arguing that the State's refusal to allow its scholarship money to go toward such degrees violated his free exercise rights.

This Court disagreed. It began by explaining what was *not* at issue. Washington's selective funding program was not comparable to the free exercise violations found in the "*Lukumi* line of cases," including those striking down laws requiring individuals to "choose between their religious beliefs and receiving a government benefit." *Id.*, at 720–721. At the outset, then, the Court made clear that *Locke* was not like the case now before us.

Washington's restriction on the use of its scholarship funds was different. According to the Court, the State had "merely chosen not to fund a distinct category of instruction." *Id.*, at 721. Davey was not denied a scholarship because of who he *was*; he was denied a scholarship because of what he proposed *to do*—use the funds to prepare for the ministry. Here there is no question that Trinity Lutheran was denied a grant simply because of what it is—a church.

The Court in *Locke* also stated that Washington's choice was in keeping with the State's antiestablishment interest in not using taxpayer funds to pay for the training of clergy; in fact, the Court could "think of few areas in which a State's antiestablishment interests come more into play." *Id.,* at 722. The claimant in *Locke* sought funding for an "essentially religious endeavor . . . akin to a religious calling as well as an academic pursuit," and opposition to such funding "to support church leaders" lay at the historic core of the Religion Clauses. *Id.,* at 721–722. Here nothing of the sort can be said about a program to use recycled tires to resurface playgrounds.

Relying on *Locke*, the Department nonetheless emphasizes Missouri's similar constitutional tradition of not furnishing taxpayer money directly to churches. Brief for Respondent 15–16. But *Locke* took account of Washington's antiestablishment interest only after determining, as noted, that the scholarship program did not "require students to choose between their religious beliefs and receiving a government benefit." 540 U. S., at 720–721 (citing *McDaniel*, 435 U. S. 618). As the Court put it, Washington's scholarship program went "a long way toward including religion in its benefits." *Locke*, 540 U. S., at 724. Students in the program were free to use their scholarships at "pervasively religious schools." *Ibid.* Davey could use his scholarship to pursue a secular degree at one institution while studying devotional theology at another. *Id.,* at 721, n. 4. He could also use his scholarship money to attend a religious college and take devotional theology courses there. *Id.,* at 725. The only thing he could not do was use the scholarship to pursue a degree in that subject.

In this case, there is no dispute that Trinity Lutheran *is* put to the choice between being a church and receiving a government benefit. The rule is simple: No churches need

apply.[3]

## C

The State in this case expressly requires Trinity Lutheran to renounce its religious character in order to participate in an otherwise generally available public benefit program, for which it is fully qualified. Our cases make clear that such a condition imposes a penalty on the free exercise of religion that must be subjected to the "most rigorous" scrutiny. *Lukumi*, 508 U. S., at 546.[4]

Under that stringent standard, only a state interest "of the highest order" can justify the Department's discriminatory policy. *McDaniel*, 435 U. S., at 628 (internal quotation marks omitted). Yet the Department offers nothing more than Missouri's policy preference for skating as far as possible from religious establishment concerns. Brief for Respondent 15–16. In the face of the clear infringement on free exercise before us, that interest cannot qualify as compelling. As we said when considering Missouri's same policy preference on a prior occasion, "the state interest asserted here—in achieving greater separation of church and State than is already ensured under the Establishment Clause of the Federal Constitution—is limited by the Free Exercise Clause." *Widmar*, 454 U. S., at 276.

The State has pursued its preferred policy to the point of expressly denying a qualified religious entity a public benefit solely because of its religious character. Under our precedents, that goes too far. The Department's policy

––––––––––

[3] This case involves express discrimination based on religious identity with respect to playground resurfacing. We do not address religious uses of funding or other forms of discrimination.

[4] We have held that "a law targeting religious beliefs as such is never permissible." *Lukumi,* 508 U. S., at 533; see also *McDaniel* v. *Paty*, 435 U. S. 618, 626 (1978) (plurality opinion). We do not need to decide whether the condition Missouri imposes in this case falls within the scope of that rule, because it cannot survive strict scrutiny in any event.

violates the Free Exercise Clause.[5]

\* \* \*

Nearly 200 years ago, a legislator urged the Maryland Assembly to adopt a bill that would end the State's disqualification of Jews from public office:

> "If, on account of my religious faith, I am subjected to disqualifications, from which others are free, . . . I cannot but consider myself a persecuted man. . . . An odious exclusion from any of the benefits common to the rest of my fellow-citizens, is a persecution, differing only in degree, but of a nature equally unjustifiable with that, whose instruments are chains and torture." Speech by H. M. Brackenridge, Dec. Sess. 1818, in H. Brackenridge, W. Worthington, & J. Tyson, Speeches in the House of Delegates of Maryland, 64 (1829).

The Missouri Department of Natural Resources has not subjected anyone to chains or torture on account of religion. And the result of the State's policy is nothing so dramatic as the denial of political office. The consequence is, in all likelihood, a few extra scraped knees. But the exclusion of Trinity Lutheran from a public benefit for which it is otherwise qualified, solely because it is a church, is odious to our Constitution all the same, and cannot stand.

The judgment of the United States Court of Appeals for the Eighth Circuit is reversed, and the case is remanded for further proceedings consistent with this opinion.

*It is so ordered.*

---

[5] Based on this holding, we need not reach the Church's claim that the policy also violates the Equal Protection Clause.

# SUPREME COURT OF THE UNITED STATES

_____

No. 15–577

_____

## TRINITY LUTHERAN CHURCH OF COLUMBIA, INC., PETITIONER *v.* CAROL S. COMER, DIRECTOR, MISSOURI DEPARTMENT OF NATURAL RESOURCES

### ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE EIGHTH CIRCUIT

[June 26, 2017]

JUSTICE THOMAS, with whom JUSTICE GORSUCH joins, concurring in part.

The Court today reaffirms that "denying a generally available benefit solely on account of religious identity imposes a penalty on the free exercise of religion that can be justified," if at all, "only by a state interest 'of the highest order.'" *Ante*, at 6. The Free Exercise Clause, which generally prohibits laws that facially discriminate against religion, compels this conclusion. See *Locke* v. *Davey*, 540 U. S. 712, 726–727 (2004) (Scalia, J., dissenting).

Despite this prohibition, the Court in *Locke* permitted a State to "disfavor . . . religion" by imposing what it deemed a "relatively minor" burden on religious exercise to advance the State's antiestablishment "interest in not funding the religious training of clergy." *Id.*, at 720, 722, n. 5, 725. The Court justified this law based on its view that there is "'play in the joints'" between the Free Exercise Clause and the Establishment Clause—that is, that "there are some state actions permitted by the Establishment Clause but not required by the Free Exercise Clause." *Id.*, at 719. Accordingly, *Locke* did not subject the law at issue to any form of heightened scrutiny. But it also did not suggest that discrimination against religion outside the

limited context of support for ministerial training would
be similarly exempt from exacting review.

This Court's endorsement in *Locke* of even a "mil[d]
kind," *id.*, at 720, of discrimination against religion re-
mains troubling. See generally *id.*, at 726–734 (Scalia, J.,
dissenting). But because the Court today appropriately
construes *Locke* narrowly, see Part III–B, *ante*, and be-
cause no party has asked us to reconsider it, I join nearly
all of the Court's opinion. I do not, however, join footnote
3, for the reasons expressed by JUSTICE GORSUCH, *post*,
p. 1 (opinion concurring in part).

# SUPREME COURT OF THE UNITED STATES

_____

No. 15–577

_____

## TRINITY LUTHERAN CHURCH OF COLUMBIA, INC., PETITIONER *v.* CAROL S. COMER, DIRECTOR, MISSOURI DEPARTMENT OF NATURAL RESOURCES

ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF
APPEALS FOR THE EIGHTH CIRCUIT

[June 26, 2017]

JUSTICE GORSUCH, with whom JUSTICE THOMAS joins, concurring in part.

Missouri's law bars Trinity Lutheran from participating in a public benefits program only because it is a church. I agree this violates the First Amendment and I am pleased to join nearly all of the Court's opinion. I offer only two modest qualifications.

First, the Court leaves open the possibility a useful distinction might be drawn between laws that discriminate on the basis of religious *status* and religious *use*. See *ante*, at 12. Respectfully, I harbor doubts about the stability of such a line. Does a religious man say grace before dinner? Or does a man begin his meal in a religious manner? Is it a religious group that built the playground? Or did a group build the playground so it might be used to advance a religious mission? The distinction blurs in much the same way the line between acts and omissions can blur when stared at too long, leaving us to ask (for example) whether the man who drowns by awaiting the incoming tide does so by act (coming upon the sea) or omission (allowing the sea to come upon him). See *Cruzan* v. *Director, Mo. Dept. of Health*, 497 U. S. 261, 296 (1990) (Scalia, J., dissenting). Often enough the same facts can

be described both ways.

Neither do I see why the First Amendment's Free Exercise Clause should care. After all, that Clause guarantees the free *exercise* of religion, not just the right to inward belief (or status). *Employment Div., Dept. of Human Resources of Ore.* v. *Smith*, 494 U. S. 872, 877 (1990). And this Court has long explained that government may not "devise mechanisms, overt or disguised, designed to persecute or oppress a religion or its practices." *Church of Lukumi Babalu Aye, Inc.* v. *Hialeah*, 508 U. S. 520, 547 (1993). Generally the government may not force people to choose between participation in a public program and their right to free exercise of religion. See *Thomas* v. *Review Bd. of Indiana Employment Security Div.*, 450 U. S. 707, 716 (1981); *Everson* v. *Board of Ed. of Ewing*, 330 U. S. 1, 16 (1947). I don't see why it should matter whether we describe that benefit, say, as closed to Lutherans (status) or closed to people who do Lutheran things (use). It is free exercise either way.

For these reasons, reliance on the status-use distinction does not suffice for me to distinguish *Locke* v. *Davey*, 540 U. S. 712 (2004). See *ante*, at 12. In that case, this Court upheld a funding restriction barring a student from using a scholarship to pursue a degree in devotional theology. But can it really matter whether the restriction in *Locke* was phrased in terms of use instead of status (for was it a student who wanted a vocational degree in religion? or was it a religious student who wanted the necessary education for his chosen vocation?). If that case can be correct and distinguished, it seems it might be only because of the opinion's claim of a long tradition against the use of public funds for training of the clergy, a tradition the Court correctly explains has no analogue here. *Ante*, at 13.

Second and for similar reasons, I am unable to join the footnoted observation, *ante*, at 14, n. 3, that "[t]his case involves express discrimination based on religious identity

with respect to playground resurfacing." Of course the footnote is entirely correct, but I worry that some might mistakenly read it to suggest that only "playground resurfacing" cases, or only those with some association with children's safety or health, or perhaps some other social good we find sufficiently worthy, are governed by the legal rules recounted in and faithfully applied by the Court's opinion. Such a reading would be unreasonable for our cases are "governed by general principles, rather than ad hoc improvisations." *Elk Grove Unified School Dist.* v. *Newdow*, 542 U. S. 1, 25 (2004) (Rehnquist, C. J., concurring in judgment). And the general principles here do not permit discrimination against religious exercise—whether on the playground or anywhere else.

# SUPREME COURT OF THE UNITED STATES

_____

No. 15–577

_____

## TRINITY LUTHERAN CHURCH OF COLUMBIA, INC., PETITIONER *v.* CAROL S. COMER, DIRECTOR, MISSOURI DEPARTMENT OF NATURAL RESOURCES

ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE EIGHTH CIRCUIT

[June 26, 2017]

JUSTICE BREYER, concurring in the judgment.

I agree with much of what the Court says and with its result. But I find relevant, and would emphasize, the particular nature of the "public benefit" here at issue. Cf. *ante,* at 11 ("Trinity Lutheran . . . asserts a right to participate in a government benefit program"); *ante*, at 12 (referring to precedent "striking down laws requiring individuals to choose between their religious beliefs and receiving a government benefit" (internal quotation marks omitted)); *ante*, at 10 (referring to Trinity Lutheran's "automatic and absolute exclusion from the benefits of a public program"); *ante*, at 9–10 (the State's policy disqualifies "otherwise eligible recipients . . . from a public benefit solely because of their religious character"); *ante*, at 6–7 (quoting the statement in *Everson* v. *Board of Ed. of Ewing*, 330 U. S. 1, 16 (1947), that the State "cannot exclude" individuals "*because of their faith*" from "receiving the benefits of public welfare legislation").

The Court stated in *Everson* that "cutting off church schools from" such "general government services as ordinary police and fire protection . . . is obviously not the purpose of the First Amendment." 330 U. S., at 17–18. Here, the State would cut Trinity Lutheran off from par-

ticipation in a general program designed to secure or to improve the health and safety of children. I see no significant difference. The fact that the program at issue ultimately funds only a limited number of projects cannot itself justify a religious distinction. Nor is there any administrative or other reason to treat church schools differently. The sole reason advanced that explains the difference is faith. And it is that last-mentioned fact that calls the Free Exercise Clause into play. We need not go further. Public benefits come in many shapes and sizes. I would leave the application of the Free Exercise Clause to other kinds of public benefits for another day.

# SUPREME COURT OF THE UNITED STATES

—————

No. 15–577

—————

## TRINITY LUTHERAN CHURCH OF COLUMBIA, INC., PETITIONER *v.* CAROL S. COMER, DIRECTOR, MISSOURI DEPARTMENT OF NATURAL RESOURCES

ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE EIGHTH CIRCUIT

[June 26, 2017]

JUSTICE SOTOMAYOR, with whom JUSTICE GINSBURG joins, dissenting.

To hear the Court tell it, this is a simple case about recycling tires to resurface a playground. The stakes are higher. This case is about nothing less than the relationship between religious institutions and the civil government—that is, between church and state. The Court today profoundly changes that relationship by holding, for the first time, that the Constitution requires the government to provide public funds directly to a church. Its decision slights both our precedents and our history, and its reasoning weakens this country's longstanding commitment to a separation of church and state beneficial to both.

I

Founded in 1922, Trinity Lutheran Church (Church) "operates . . . for the express purpose of carrying out the commission of . . . Jesus Christ as directed to His church on earth." Our Story, http://www.trinity-lcms.org/story (all internet materials as last visited June 22, 2017). The Church uses "preaching, teaching, worship, witness, service, and fellowship according to the Word of God" to carry out its mission "to 'make disciples.'" Mission,

http://www.trinity-lcms.org/mission (quoting Matthew 28:18–20). The Church's religious beliefs include its desire to "associat[e] with the [Trinity Church Child] Learning Center." App. to Pet. for Cert. 101a. Located on Church property, the Learning Center provides daycare and pre-school for about "90 children ages two to kindergarten." *Id.,* at 100a.

The Learning Center serves as "a ministry of the Church and incorporates daily religion and developmentally appropriate activities into . . . [its] program." *Id.,* at 101a. In this way, "[t]hrough the Learning Center, the Church teaches a Christian world view to children of members of the Church, as well as children of non-member residents" of the area. *Ibid.* These activities represent the Church's "sincere religious belief . . . to use [the Learning Center] to teach the Gospel to children of its members, as well to bring the Gospel message to non-members." *Ibid.*

The Learning Center's facilities include a playground, the unlikely source of this dispute. The Church provides the playground and other "safe, clean, and attractive" facilities "in conjunction with an education program structured to allow a child to grow spiritually, physically, socially, and cognitively." *Ibid.* This case began in 2012 when the Church applied for funding to upgrade the playground's pea gravel and grass surface through Missouri's Scrap Tire Program, which provides grants for the purchase and installation of recycled tire material to resurface playgrounds. The Church sought $20,000 for a $30,580 project to modernize the playground, part of its effort to gain state accreditation for the Learning Center as an early childhood education program. Missouri denied the Church funding based on Article I, §7, of its State Constitution, which prohibits the use of public funds "in aid of any church, sect, or denomination of religion."

## II

Properly understood then, this is a case about whether Missouri can decline to fund improvements to the facilities the Church uses to practice and spread its religious views. This Court has repeatedly warned that funding of exactly this kind—payments from the government to a house of worship—would cross the line drawn by the Establishment Clause. See, *e.g., Walz* v. *Tax Comm'n of City of New York*, 397 U. S. 664, 675 (1970); *Rosenberger* v. *Rector and Visitors of Univ. of Va.*, 515 U. S. 819, 844 (1995); *Mitchell* v. *Helms*, 530 U. S. 793, 843–844 (2000) (O'Connor, J., concurring in judgment). So it is surprising that the Court mentions the Establishment Clause only to note the parties' agreement that it "does not prevent Missouri from including Trinity Lutheran in the Scrap Tire Program." *Ante,* at 6. Constitutional questions are decided by this Court, not the parties' concessions. The Establishment Clause does not allow Missouri to grant the Church's funding request because the Church uses the Learning Center, including its playground, in conjunction with its religious mission. The Court's silence on this front signals either its misunderstanding of the facts of this case or a startling departure from our precedents.

## A

The government may not directly fund religious exercise. See *Everson* v. *Board of Ed. of Ewing*, 330 U. S. 1, 16 (1947); *Mitchell*, 530 U. S., at 840 (O'Connor, J., concurring in judgment) ("[O]ur decisions provide no precedent for the use of public funds to finance religious activities" (internal quotation marks omitted)). Put in doctrinal terms, such funding violates the Establishment Clause because it impermissibly "advanc[es] . . . religion."[1] *Agos-*

———————

[1] Government aid that has the "purpose" or "effect of advancing or inhibiting religion" violates the Establishment Clause. *Agostini* v.

*tini* v. *Felton*, 521 U. S. 203, 222–223 (1997).

Nowhere is this rule more clearly implicated than when funds flow directly from the public treasury to a house of worship.[2]  A house of worship exists to foster and further religious exercise.  There, a group of people, bound by common religious beliefs, comes together "to shape its own faith and mission." *Hosanna-Tabor Evangelical Lutheran Church and School* v. *EEOC*, 565 U. S. 171, 188 (2012).  Within its walls, worshippers gather to practice and reaffirm their faith.  And from its base, the faithful reach out to those not yet convinced of the group's beliefs.  When a government funds a house of worship, it underwrites this religious exercise.

*Tilton* v. *Richardson*, 403 U. S. 672 (1971), held as much.  The federal program at issue provided construction grants to colleges and universities but prohibited grantees from using the funds to construct facilities "'used for sectarian instruction or as a place for religious worship'" or "'used primarily in connection with any part of the program of a school or department of divinity.'" *Id.,* at 675 (plurality opinion) (quoting 20 U. S. C. §751(a)(2) (1964 ed., Supp. V)).  It allowed the Federal Government to recover the grant's value if a grantee violated this prohibition within twenty years of the grant.  See 403 U. S., at 675.  The Court unanimously agreed that this time limit

_____

*Felton*, 521 U. S. 203, 222–223 (1997) (internal quotation marks omitted).  Whether government aid has such an effect turns on whether it "result[s] in governmental indoctrination," "define[s] its recipients by reference to religion," or "create[s] an excessive entanglement" between the government and religion. *Id.,* at 234; see also *id.,* at 235 (same considerations speak to whether the aid can "reasonably be viewed as an endorsement of religion").

[2] Because Missouri decides which Scrap Tire Program applicants receive state funding, this case does not implicate a line of decisions about indirect aid programs in which aid reaches religious institutions "only as a result of the genuine and independent choices of private individuals." *Zelman* v. *Simmons-Harris*, 536 U. S. 639, 649 (2002).

on recovery violated the Establishment Clause. "[T]he original federal grant w[ould] in part have the effect of advancing religion," a plurality explained, if a grantee "converted [a facility] into a chapel or otherwise used [it] to promote religious interests" after twenty years. *Id.,* at 683; see also *id.*, at 692 (Douglas, J., concurring in part and dissenting in part); *Lemon* v. *Kurtzman*, 403 U. S. 602, 659–661 (1971) (Brennan, J., concurring); *id.*, at 665, n. 1 (opinion of White, J.). Accordingly, the Court severed the twenty-year limit, ensuring that program funds would be put to secular use and thereby bringing the program in line with the Establishment Clause. See *Tilton*, 403 U. S., at 683 (plurality opinion).

This case is no different. The Church seeks state funds to improve the Learning Center's facilities, which, by the Church's own avowed description, are used to assist the spiritual growth of the children of its members and to spread the Church's faith to the children of nonmembers. The Church's playground surface—like a Sunday School room's walls or the sanctuary's pews—are integrated with and integral to its religious mission. The conclusion that the funding the Church seeks would impermissibly advance religion is inescapable.

True, this Court has found some direct government funding of religious institutions to be consistent with the Establishment Clause. But the funding in those cases came with assurances that public funds would not be used for religious activity, despite the religious nature of the institution. See, *e.g., Rosenberger*, 515 U. S., at 875–876 (Souter, J., dissenting) (chronicling cases). The Church has not and cannot provide such assurances here.[3] See

———————

[3] The Scrap Tire Program requires an applicant to certify, among other things, that its mission and activities are secular and that it will put program funds to only a secular use. App. to Pet. for Cert. 127a–130a. From the record, it is unclear whether the Church provided any part of this certification. *Id.*, at 127a–130a. In any case, the Church

*Committee for Public Ed. & Religious Liberty* v. *Nyquist*,
413 U. S. 756, 774 (1973) ("No attempt is made to restrict
payments to those expenditures related to the upkeep of
facilities used exclusively for secular purposes, nor do we
think it possible within the context of these religion-
oriented institutions to impose such restrictions").  The
Church has a religious mission, one that it pursues
through the Learning Center.  The playground surface
cannot be confined to secular use any more than lumber
used to frame the Church's walls, glass stained and used
to form its windows, or nails used to build its altar.

### B

The Court may simply disagree with this account of the
facts and think that the Church does not put its play-
ground to religious use.  If so, its mistake is limited to this
case.  But if it agrees that the State's funding would fur-
ther religious activity and sees no Establishment Clause
problem, then it must be implicitly applying a rule other
than the one agreed to in our precedents.

When the Court last addressed direct funding of reli-
gious institutions, in *Mitchell*, it adhered to the rule that
the Establishment Clause prohibits the direct funding of
religious activities.  At issue was a federal program that
helped state and local agencies lend educational materials
to public and private schools, including religious schools.
See 530 U. S., at 801–803 (plurality opinion).  The control-
ling concurrence assured itself that the program would not
lead to the public funding of religious activity.  It pointed
out that the program allocated secular aid, that it did so
"on the basis of neutral, secular criteria," that the aid
would not "supplant non-[program] funds," that "no . . .
funds ever reach the coffers of religious schools," that
"evidence of actual diversion is *de minimis*," and that the

---

has not offered any such assurances to this Court.

program had "adequate safeguards" to police violations. *Id.,* at 867 (O'Connor, J., concurring in judgment). Those factors, it concluded, were "sufficient to find that the program . . . [did] not have the impermissible effect of advancing religion." *Ibid.*

A plurality would have instead upheld the program based only on the secular nature of the aid and the program's "neutrality" as to the religious or secular nature of the recipient. See *id.,* at 809–814. The controlling concurrence rejected that approach. It viewed the plurality's test—"secular content aid . . . distributed on the basis of wholly neutral criteria"—as constitutionally insufficient. *Id.*, at 839. This test, explained the concurrence, ignored whether the public funds subsidize religion, the touchstone of establishment jurisprudence. See *id.,* at 844 (noting that the plurality's logic would allow funding of "religious organizations (including churches)" where "the participating religious organizations (including churches) . . . use that aid to support religious indoctrination").

Today's opinion suggests the Court has made the leap the *Mitchell* plurality could not. For if it agrees that the funding here will finance religious activities, then only a rule that considers that fact irrelevant could support a conclusion of constitutionality. The problems of the "secular and neutral" approach have been aired before. See, *e.g., id.*, at 900–902 (Souter, J., dissenting). It has no basis in the history to which the Court has repeatedly turned to inform its understanding of the Establishment Clause. It permits direct subsidies for religious indoctrination, with all the attendant concerns that led to the Establishment Clause. And it favors certain religious groups, those with a belief system that allows them to compete for public dollars and those well-organized and well-funded enough to do so successfully.[4]

————————

[4] This case highlights the weaknesses of the rule. The Scrap Tire

Such a break with precedent would mark a radical mistake. The Establishment Clause protects both religion and government from the dangers that result when the two become entwined, "*not* by providing every religion with an *equal opportunity* (say, to secure state funding or to pray in the public schools), but by drawing fairly clear lines of *separation* between church and state—at least where the heartland of religious belief, such as primary religious [worship], is at issue." *Zelman* v. *Simmons-Harris*, 536 U. S. 639, 722–723 (2002) (BREYER, J., dissenting).

## III

Even assuming the absence of an Establishment Clause violation and proceeding on the Court's preferred front— the Free Exercise Clause—the Court errs. It claims that the government may not draw lines based on an entity's religious "status." But we have repeatedly said that it can. When confronted with government action that draws such a line, we have carefully considered whether the interests embodied in the Religion Clauses justify that line. The question here is thus whether those interests support the line drawn in Missouri's Article I, §7, separating the State's treasury from those of houses of worship. They unquestionably do.

## A

The Establishment Clause prohibits laws "respecting an establishment of religion" and the Free Exercise Clause prohibits laws "prohibiting the free exercise thereof."

––––––––––

Program ranks more highly those applicants who agree to generate media exposure for Missouri and its program and who receive the endorsement of local solid waste management entities. That is, it prefers applicants who agree to advertise that the government has funded it and who seek out the approval of government agencies. To ignore this result is to ignore the type of state entanglement with, and endorsement of, religion the Establishment Clause guards against.

U. S. Const., Amdt. 1. "[I]f expanded to a logical extreme," these prohibitions "would tend to clash with the other." *Walz*, 397 U. S., at 668–669. Even in the absence of a violation of one of the Religion Clauses, the interaction of government and religion can raise concerns that sound in both Clauses. For that reason, the government may sometimes act to accommodate those concerns, even when not required to do so by the Free Exercise Clause, without violating the Establishment Clause. And the government may sometimes act to accommodate those concerns, even when not required to do so by the Establishment Clause, without violating the Free Exercise Clause. "[T]here is room for play in the joints productive of a benevolent neutrality which will permit religious exercise to exist without sponsorship and without interference." *Id.*, at 669. This space between the two Clauses gives government some room to recognize the unique status of religious entities and to single them out on that basis for exclusion from otherwise generally applicable laws.

Invoking this principle, this Court has held that the government may sometimes relieve religious entities from the requirements of government programs. A State need not, for example, require nonprofit houses of worship to pay property taxes. It may instead "spar[e] the exercise of religion from the burden of property taxation levied on private profit institutions" and spare the government "the direct confrontations and conflicts that follow in the train of those legal processes" associated with taxation. See *id.*, at 673–674. Nor must a State require nonprofit religious entities to abstain from making employment decisions on the basis of religion. It may instead avoid imposing on these institutions a "[f]ear of potential liability [that] might affect the way" it "carried out what it understood to be its religious mission" and on the government the sensitive task of policing compliance. *Corporation of Presiding Bishop of Church of Jesus Christ of Latter-day Saints* v.

*Amos*, 483 U. S. 327, 336 (1987); see also *id.,* at 343 (Brennan, J., concurring in judgment).  But the government may not invoke the space between the Religion Clauses in a manner that "devolve[s] into an unlawful fostering of religion."  *Cutter* v. *Wilkinson*, 544 U. S. 709, 714 (2005) (internal quotation marks omitted).

Invoking this same principle, this Court has held that the government may sometimes close off certain government aid programs to religious entities.  The State need not, for example, fund the training of a religious group's leaders, those "who will preach their beliefs, teach their faith, and carry out their mission," *Hosanna-Tabor*, 565 U. S., at 196.  It may instead avoid the historic "antiestablishment interests" raised by the use of "taxpayer funds to support church leaders."  *Locke* v. *Davey*, 540 U. S. 712, 722 (2004).

When reviewing a law that, like this one, singles out religious entities for exclusion from its reach, we thus have not myopically focused on the fact that a law singles out religious entities, but on the reasons that it does so.

B

Missouri has decided that the unique status of houses of worship requires a special rule when it comes to public funds.  Its Constitution reflects that choice and provides:

"That no money shall ever be taken from the public treasury, directly or indirectly, in aid of any church, sect, or denomination of religion, or in aid of any priest, preacher, minister or teacher thereof, as such; and that no preference shall be given to nor any discrimination made against any church, sect or creed of religion, or any form of religious faith or worship." Art. I, §7.

Missouri's decision, which has deep roots in our Nation's history, reflects a reasonable and constitutional judgment.

1

This Court has consistently looked to history for guidance when applying the Constitution's Religion Clauses. Those Clauses guard against a return to the past, and so that past properly informs their meaning. See, *e.g., Everson*, 330 U. S., at 14–15; *Torcaso* v. *Watkins*, 367 U. S. 488, 492 (1961). This case is no different.

This Nation's early experience with, and eventual rejection of, established religion—shorthand for "sponsorship, financial support, and active involvement of the sovereign in religious activity," *Walz*, 397 U. S., at 668—defies easy summary. No two States' experiences were the same. In some a religious establishment never took hold. See T. Curry, The First Freedoms 19, 72–74, 76–77, 159–160 (1986) (Curry). In others establishment varied in terms of the sect (or sects) supported, the nature and extent of that support, and the uniformity of that support across the State. Where establishment did take hold, it lost its grip at different times and at different speeds. See T. Cobb, The Rise of Religious Liberty in America 510–511 (1970 ed.) (Cobb).

Despite this rich diversity of experience, the story relevant here is one of consistency. The use of public funds to support core religious institutions can safely be described as a hallmark of the States' early experiences with religious establishment. Every state establishment saw laws passed to raise public funds and direct them toward houses of worship and ministers. And as the States all disestablished, one by one, they all undid those laws.[5]

––––––––

[5] This Court did not hold that the Religion Clauses applied, through the Fourteenth Amendment, to the States until the 1940's. See *Cantwell* v. *Connecticut*, 310 U. S. 296 (1940) (Free Exercise Clause); *Everson* v. *Board of Ed. of Ewing*, 330 U. S. 1 (1947) (Establishment Clause). When the States dismantled their religious establishments, as all had by the 1830's, they did so on their own accord, in response to the lessons taught by their experiences with religious establishments.

Those who fought to end the public funding of religion based their opposition on a powerful set of arguments, all stemming from the basic premise that the practice harmed both civil government and religion. The civil government, they maintained, could claim no authority over religious belief. For them, support for religion compelled by the State marked an overstep of authority that would only lead to more. Equally troubling, it risked divisiveness by giving religions reason to compete for the State's beneficence. Faith, they believed, was a personal matter, entirely between an individual and his god. Religion was best served when sects reached out on the basis of their tenets alone, unsullied by outside forces, allowing adherents to come to their faith voluntarily. Over and over, these arguments gained acceptance and led to the end of state laws exacting payment for the support of religion.

Take Virginia. After the Revolution, Virginia debated and rejected a general religious assessment. The proposed bill would have allowed taxpayers to direct payments to a Christian church of their choice to support a minister, exempted "Quakers and Menonists," and sent undirected assessments to the public treasury for "seminaries of learning." A Bill Establishing a Provision for Teachers of the Christian Religion, reprinted in *Everson*, 330 U. S., at 74 (supplemental appendix to dissent of Rutledge, J.).

In opposing this proposal, James Madison authored his famous Memorial and Remonstrance, in which he condemned the bill as hostile to religious freedom. Memorial and Remonstrance Against Religious Assessments (1785), in 5 The Founders' Constitution 82–84 (P. Kurland & R. Lerner eds. 1987). Believing it "proper to take alarm," despite the bill's limits, he protested "that the same authority which can force a citizen to contribute three pence only of his property for the support of any one establishment, may force him to conform to any other establishment." *Id.,* at 82. Religion had "flourished, not only with-

out the support of human laws, but in spite of every opposition from them." *Id.,* at 83. Compelled support for religion, he argued, would only weaken believers' "confidence in its innate excellence," strengthen others' "suspicion that its friends are too conscious of its fallacies to trust in its own merits," and harm the "purity and efficacy" of the supported religion. *Ibid.* He ended by deeming the bill incompatible with Virginia's guarantee of "'free exercise of . . . Religion according to the dictates of conscience.'" *Id.,* at 84.

Madison contributed one influential voice to a larger chorus of petitions opposed to the bill. Others included "the religious bodies of Baptists, Presbyterians, and Quakers." T. Buckley, Church and State in Revolutionary Virginia 1776–1787, p. 148 (1977). Their petitions raised similar points. See *id.,* at 137–140, 148–149. Like Madison, many viewed the bill as a step toward a dangerous church-state relationship. See *id.,* at 151. These voices against the bill won out, and Virginia soon prohibited religious assessments. See Virginia Act for Establishing Religious Freedom (Oct. 31, 1785), in 5 The Founders' Constitution 84–85.

This same debate played out in nearby Maryland, with the same result. In 1784, an assessment bill was proposed that would have allowed taxpayers to direct payments to ministers (of sufficiently large churches) or to the poor. Non-Christians were exempt. See Curry 155. Controversy over the bill "eclipse[d] in volume of writing and bitterness of invective every other political dispute since the debate over the question of independence." J. Rainbolt, The Struggle To Define "Religious Liberty" in Maryland, 1776–85, 17 J. Church & State 443, 449 (1975). Critics of the bill raised the same themes as those in Virginia: that religion "needs not the power of rules to establish, but only to protect it"; that financial support of religion leads toward an establishment; and that laws for such support are

"oppressive." Curry 156, 157 (internal quotation marks omitted); see also Copy of Petition [to General Assembly], Maryland Gazette, Mar. 25, 1785, pp. 1, 2, col.1 ("[W]hy should such as do not desire or make conscience of it, be forced by law"). When the legislature next met, most representatives "had been elected by anti-assessment voters," and the bill failed. Curry 157. In 1810, Maryland revoked the authority to levy religious assessments. See Md. Const., Amdt. XIII (1776), in 3 Federal and State Constitutions 1705 (F. Thorpe ed. 1909) (Thorpe).

In New England, which took longer to reach this conclusion, Vermont went first. Its religious assessment laws were accommodating. A person who was not a member of his town's church was, upon securing a certificate to that effect, exempt. See L. Levy, The Establishment Clause 50 (1994) (Levy). Even so, the laws were viewed by many as violating Vermont's constitutional prohibition against involuntary support of religion and guarantee of freedom of conscience. See, *e.g.*, Address of Council of Censors to the People of Vermont 5–8 (1800) ("[R]eligion is a concern personally and exclusively operative between the individual and his God"); Address of Council of Censors [Vermont] 3–7 (Dec. 1806) (the laws' "evils" included "violence done to the feelings of men" and "their property," "animosities," and "the dangerous lengths of which it is a foundation for us to go, in both civil and religious usurpation"). In 1807, Vermont "repealed all laws concerning taxation for religion." Levy 51.

The rest of New England heard the same arguments and reached the same conclusion. John Leland's sustained criticism of religious assessments over 20 years helped end the practice in Connecticut. See, *e.g.,* Esbeck, Dissent and Disestablishment: The Church-State Settlement in the Early American Republic, 2004 B. Y. U. L. Rev. 1385, 1498, 1501–1511. The reasons he offered in urging opposition to the State's laws will by now be famil-

iar. Religion "is a matter between God and individuals," which does not need, and would only be harmed by, government support. J. Leland, The Rights of Conscience Inalienable (1791), in The Sacred Rights of Conscience 337–339 (D. Dreisbach & M. Hall eds. 2009). "[T]ruth gains honor; and men more firmly believe it," when religion is subjected to the "cool investigation and fair argument" that freedom of conscience produces. *Id.,* at 340. Religious assessments violated that freedom, he argued. See *id.,* at 342 ("If these people bind nobody but themselves, who is injured by their religious opinions? But if they bind an individual besides themselves, the bond is fraudulent and ought to be declared illegal"). Connecticut ended religious assessments first by statute in 1817, then by its State Constitution of 1818. See Cobb 513.

In New Hampshire, a steady campaign against religious assessments led to a bill that was subjected to "the scrutiny of the people." C. Kinney, Church & State: The Struggle for Separation in New Hampshire, 1630–1900, p. 101 (1955) (Kinney). It was nicknamed "Dr. Whipple's Act" after its strongest advocate in the State House. *Orford Union Congregational Soc.* v. *West Congregational Soc. of Orford*, 55 N. H. 463, 468–469, n. (1875). He defended the bill as a means "to take religion out of politics, to eliminate state support, to insure opportunity to worship with true freedom of conscience, [and] to put all sects and denominations of Christians upon a level." Kinney 103. The bill became law and provided "that no person shall be compelled to join or support, or be classed with, or associated to any congregation, church or religious society without his express consent first had and obtained." Act [of July 1, 1819] Regulating Towns and Choice of Town Officers §3, in 1 Laws of the State of New Hampshire Enacted Since June 1, 1815, p. 45 (1824). Massachusetts held on the longest of all the States, finally ending religious assess-

ments in 1833.  See Cobb 515.[6]

The course of this history shows that those who lived under the laws and practices that formed religious establishments made a considered decision that civil government should not fund ministers and their houses of worship.  To us, their debates may seem abstract and this history remote.  That is only because we live in a society that has long benefited from decisions made in response to these now centuries-old arguments, a society that those not so fortunate fought hard to build.

2

In *Locke*, this Court expressed an understanding of, and respect for, this history.  *Locke* involved a provision of the State of Washington's Constitution that, like Missouri's nearly identical Article I, §7, barred the use of public funds for houses of worship or ministers.  Consistent with this denial of funds to ministers, the State's college scholarship program did not allow funds to be used for devotional theology degrees.  When asked whether this violated the would-be minister's free exercise rights, the Court invoked the play in the joints principle and answered no.  The Establishment Clause did not require the prohibition because "the link between government funds and religious training [was] broken by the independent and private choice of [scholarship] recipients."  540 U. S., at 719; see also *supra*, n. 2.  Nonetheless, the denial did not violate the Free Exercise Clause because a "historic and substantial state interest" supported the constitutional provision.

_____

[6]To this, some might point out that the Scrap Tire Program at issue here does not impose an assessment specifically for religious entities but rather directs funds raised through a general taxation scheme to the Church.  That distinction makes no difference.  The debates over religious assessment laws focused not on the means of those laws but on their ends: the turning over of public funds to religious entities.  See, *e.g., Locke* v. *Davey*, 540 U. S. 712, 723 (2004).

540 U. S., at 725. The Court could "think of few areas in which a State's antiestablishment interests come more into play" than the "procuring [of] taxpayer funds to support church leaders." *Id.,* at 722.

The same is true of this case, about directing taxpayer funds to houses of worship, see *supra*, at 2. Like the use of public dollars for ministers at issue in *Locke*, turning over public funds to houses of worship implicates serious anti-establishment and free exercise interests. The history just discussed fully supports this conclusion. As states disestablished, they repealed laws allowing taxation to support religion because the practice threatened other forms of government support for, involved some government control over, and weakened supporters' control of religion. Common sense also supports this conclusion. Recall that a state may not fund religious activities without violating the Establishment Clause. See Part II–A, *supra*. A state can reasonably use status as a "house of worship" as a stand-in for "religious activities." Inside a house of worship, dividing the religious from the secular would require intrusive line-drawing by government, and monitoring those lines would entangle government with the house of worship's activities. And so while not every activity a house of worship undertakes will be inseparably linked to religious activity, "the likelihood that many are makes a categorical rule a suitable means to avoid chilling the exercise of religion." *Amos*, 483 U. S., at 345 (Brennan, J., concurring in judgment). Finally, and of course, such funding implicates the free exercise rights of taxpayers by denying them the chance to decide for themselves whether and how to fund religion. If there is any "'room for play in the joints' between" the Religion Clauses, it is here. *Locke*, 540 U. S., at 718 (quoting *Walz*, 397 U. S., at 669).

As was true in *Locke*, a prophylactic rule against the use of public funds for houses of worship is a permissible accommodation of these weighty interests. The rule has a

historical pedigree identical to that of the provision in *Locke*. Almost all of the States that ratified the Religion Clauses operated under this rule. See 540 U. S., at 723. Seven had placed this rule in their State Constitutions.[7] Three enforced it by statute or in practice.[8] Only one had not yet embraced the rule.[9] Today, thirty-eight States

_____

[7] See N. J. Const., Art. XVIII (1776), in 5 Thorpe 2597 ("[N]or shall any person, within this Colony, ever be obliged to pay tithes, taxes, or any other rates, for the purpose of building or repairing any other church or churches, place or places of worship, or for the maintenance of any minister or ministry, contrary to what he believes to be right, or has deliberately or voluntarily engaged himself to perform"); N. C. Const., Art. XXXIV (1776), in *id.*, at 2793 ("[N]either shall any person, on any pretence whatsoever, . . . be obliged to pay, for the purchase of any glebe, or the building of any house of worship, or for the maintenance of any minister or ministry, contrary to what he believes right, or has voluntarily and personally engaged to perform"); Pa. Const., Art. IX, §3 (1790), in *id.*, at 3100 ("[N]o man can of right be compelled to attend, erect, or support any place of worship, or to maintain any ministry, against his consent"); S. C. Const., Art. XXXVIII (1778), in 6 *id.*, at 3257 ("No person shall, by law, be obliged to pay towards the maintenance and support of a religious worship that he does not freely join in, or has not voluntarily engaged to support"); Vt. Const., ch. 1, Art. III (1786), in *id.*, at 3752 ("[N]o man ought, or of right can be compelled to attend any religious worship, or erect, or support any place of worship, or maintain any minister, contrary to the dictates of his conscience").

Delaware and New York's Constitutions did not directly address, but were understood to prohibit, public funding of religion. See Curry, 76, 162; see also Del. Const., Art. I, §1 (1792) ("[N]o man shall or ought to be compelled to attend any religious worship, to contribute to the erection or support of any place of worship, or to the maintenance of any ministry, against his own free will and consent").

[8] See Virginia, Act for Establishing Religious Freedom, in 5 The Founders' Constitution 85 (P. Kurland & R. Lerner eds. 1987); Curry 211–212 (Rhode Island never publicly funded houses of worship); Esbeck, Dissent and Disestablishment: The Church-State Settlement in the Early American Republic, 2004 B. Y. U. L. Rev. 1385, 1489–1490 (Maryland never invoked its constitutional authorization of religious assessments).

[9] See N. H. Const., pt. 1, Arts. I, VI (1784), in 4 Thorpe 2453, 2454.

SOTOMAYOR, J., dissenting

have a counterpart to Missouri's Article I, §7.[10]  The provisions, as a general matter, date back to or before these States' original Constitutions.[11]  That so many States have

——————

[10] See Ala. Const., Art. I, §3; Ariz. Const., Art. II, §12, Art. IX, §10; Ark. Const., Art. II, §24; Cal. Const., Art. XVI, §5; Colo. Const., Art. II, §4, Art. IX, §7; Conn. Const., Art. Seventh; Del. Const., Art. I, §1; Fla. Const., Art. I, §3; Ga. Const., Art. I, §2, para. VII; Idaho Const., Art. IX, §5; Ill. Const., Art. I, §3, Art. X, §3; Ind. Const., Art. 1, §§4, 6; Iowa Const., Art. 1, §3; Ky. Const. §5; Md. Const., Decl. of Rights Art. 36; Mass. Const. Amdt., Art. XVIII, §2; Mich. Const., Art. I, §4; Minn. Const., Art. I, §16; Mo. Const., Art. I, §§6, 7, Art. IX, §8; Mont. Const., Art. X, §6; Neb. Const., Art. I, §4; N. H. Const., pt. 2, Art. 83; N. J. Const., Art. I, §3; N. M. Const., Art. II, §11; Ohio Const., Art. I, §7; Okla. Const., Art. II, §5; Ore. Const., Art. I, §5; Pa. Const., Art. I, §3, Art. III, §29; R. I. Const., Art. I, §3; S. D. Const., Art. VI, §3; Tenn. Const., Art. I, §3; Tex. Const., Art. I, §§6, 7; Utah Const., Art. I, §4; Vt. Const., ch. I, Art. 3; Va. Const., Art. I, §16, Art. IV, §16; Wash. Const., Art. I, §11; W. Va. Const., Art. III, §15; Wis. Const., Art. I, §18; Wyo. Const., Art. I, §19, Art. III, §36.

[11] See Ala. Const., Art. I, §3 (1819), in 1 Thorpe 97; Ariz. Const., Art. II, §12, Art. IX, §10 (1912); Ark. Const., Art. II, §3 (1836), in 1 Thorpe 269; Cal. Const., Art. IX, §8 (1879), in *id.*, at 432; Colo. Const., Art. II, §4, Art. V, §34 (1876), in *id.*, at 474, 485; Conn. Const., Art. First, §4, Art. Seventh, §1 (1818), in *id.,* at 537, 544–545; Del. Const., Art. I, §1 (1792); Fla. Const., Decl. of Rights §6 (1885), in 2 Thorpe 733; Ga. Const., Art. I, §1, para. XIV (1877), in *id.,* at 843; Idaho Const., Art. I, §4, Art. IX, §5 (1889), in *id.,* at 919, 936–937; Ill. Const., Art. VIII, §3 (1818) and (1870), in *id.,* at 981, 1035; Ind. Const., Art. 1, §3 (1816), Art. 1, §6 (1851), in *id.*, at 1056, 1074; Iowa Const., Art. 1, §3 (1846), in *id.,* at 1123; Ky. Const., Art. XIII, §5 (1850), in 3 *id.,* at 1312; Md. Const., Decl. of Rights Art. 36 (1867), in *id.,* at 1782; Mass. Const. Amdt., Art. XVIII (1855), in *id.,* at 1918, 1922; Mass. Const. Amdt., Art. XVIII (1974); Mich. Const., Art. 1, §4 (1835), Art. IV, §40 (1850), in 4 Thorpe 1031, 1050; Minn. Const., Art. I, §16 (1857), in *id.,* at 1092; Enabling Act for Mo., §4 (1820), Mo. Const., Art. I, §10 (1865), Art. II, §7 (1875), in *id.,* at 2146–2147, 2192, 2230; Mont. Const., Art. XI, §8 (1889), in *id.,* at 2323; Neb. Const., Art. I, §16 (1866), in *id.,* at 2350; N. H. Const., pt. 2, Art. 83 (1877); N. J. Const., Art. XVIII (1776), in 5 Thorpe 2597; N. M. Const., Art. II, §11 (1911); Ohio Const., Art. VIII, §3 (1802), in 5 Thorpe 2910; Okla. Const., Art. II, §5 (1907), in H. Snyder, The Constitution of Oklahoma 21 (1908); Ore. Const., Art. I, §5 (1857), in 5 Thorpe 2098; Pa. Const., Art. IX, §3 (1790), Art. III, §18 (1873), in

for so long drawn a line that prohibits public funding for houses of worship, based on principles rooted in this Nation's understanding of how best to foster religious liberty, supports the conclusion that public funding of houses of worship "is of a different ilk." *Locke*, 540 U. S., at 723.

And as in *Locke*, Missouri's Article I, §7, is closely tied to the state interests it protects. See *Locke*, 540 U. S., at 724 (describing the program at issue as "go[ing] a long way toward including religion in its benefits"). A straightforward reading of Article I, §7, prohibits funding only for "any church, sect, or denomination of religion, or in aid of any priest, preacher, minister or teacher thereof, as such." The Missouri courts have not read the State's Constitution to reach more broadly, to prohibit funding for other religiously affiliated institutions, or more broadly still, to prohibit the funding of religious believers. See, *e.g., Saint Louis Univ.* v. *Masonic Temple Assn. of St. Louis*, 220 S. W. 3d 721, 726 (Mo. 2007) ("The university is not a religious institution simply because it is affiliated with the Jesuits or the Roman Catholic Church"). The Scrap Tire Program at issue here proves the point. Missouri will fund a religious organization not "owned or controlled by a church," if its "mission and activities are secular (separate from religion, not spiritual in) nature" and the funds "will be used for secular (separate from religion; not spiritual) purposes rather than for sectarian (denominational, devoted to a sect) purposes." App. to Brief for Petitioner 3a;

---

*id.*, at 3100, 3120; R. I. Const., Art. I, §3 (1842), in 6 *id.*, at 3222–3223; S. D. Const., Art. VI, §3 (1889), in *id.*, at 3370; Tenn. Const., Art. XI, §3 (1796), in *id.,* at 3422; Tex. Const., Art. I, §4 (1845), Art. I, §7 (1876), in *id.,* at 3547–3548, 3622; Utah Const., Art. I, §4 (1895), in *id.,* at 3702; Vt. Const., ch. I, Art. III (1777), in *id.,* at 3740; Va. Const., Art. III, §11 (1830), Art. IV, §67 (1902), in 7 *id.*, at 3824, 3917; Wash. Const., Art. I, §11 (1889), in *id.*, at 3874; W. Va. Const., Art. II, §9 (1861–1863), in *id.*, at 4015; Wis. Const., Art. I, §18 (1848), in *id.,* at 4078–4079; Wyo. Const., Art. I, §19, Art. III, §36 (1889), in *id.,* at 4119, 4124.

see also Tr. of Oral Arg. 33–35. Article I, §7, thus stops Missouri only from funding specific entities, ones that set and enforce religious doctrine for their adherents. These are the entities that most acutely raise the establishment and free exercise concerns that arise when public funds flow to religion.

Missouri has recognized the simple truth that, even absent an Establishment Clause violation, the transfer of public funds to houses of worship raises concerns that sit exactly between the Religion Clauses. To avoid those concerns, and only those concerns, it has prohibited such funding. In doing so, it made the same choice made by the earliest States centuries ago and many other States in the years since. The Constitution permits this choice.

### 3

In the Court's view, none of this matters. It focuses on one aspect of Missouri's Article I, §7, to the exclusion of all else: that it denies funding to a house of worship, here the Church, "simply because of what it [i]s—a church." *Ante,* at 12. The Court describes this as a constitutionally impermissible line based on religious "status" that requires strict scrutiny. Its rule is out of step with our precedents in this area, and wrong on its own terms.

The Constitution creates specific rules that control how the government may interact with religious entities. And so of course a government may act based on a religious entity's "status" as such. It is that very status that implicates the interests protected by the Religion Clauses. Sometimes a religious entity's unique status requires the government to act. See *Hosanna-Tabor*, 565 U. S., at 188–190. Other times, it merely permits the government to act. See Part III–A, *supra.* In all cases, the dispositive issue is not whether religious "status" matters—it does, or the Religion Clauses would not be at issue—but whether the government must, or may, act on that basis.

Start where the Court stays silent. Its opinion does not acknowledge that our precedents have expressly approved of a government's choice to draw lines based on an entity's religious status. See *Amos*, 483 U. S., at 339; *Walz*, 397 U. S., at 680; *Locke*, 540 U. S., at 721. Those cases did not deploy strict scrutiny to create a presumption of unconstitutionality, as the Court does today. Instead, they asked whether the government had offered a strong enough reason to justify drawing a line based on that status. See *Amos*, 483 U. S., at 339 ("[W]e see no justification for applying strict scrutiny"); *Walz*, 397 U. S., at 679 (rejecting criticisms of a case-by-case approach as giving "too little weight to the fact that it is an essential part of adjudication to draw distinctions, including fine ones, in the process of interpreting the Constitution"); *Locke*, 540 U. S., at 725 (balancing the State's interests against the aspiring minister's).

The Court takes two steps to avoid these precedents. First, it recasts *Locke* as a case about a restriction that prohibited the would-be minister from "us[ing] the funds to prepare for the ministry." *Ante,* at 12. A faithful reading of *Locke* gives it a broader reach. *Locke* stands for the reasonable proposition that the government may, but need not, choose not to fund certain religious entities (there, ministers) where doing so raises "historic and substantial" establishment and free exercise concerns. 540 U. S., at 725. Second, it suggests that this case is different because it involves "discrimination" in the form of the denial of access to a possible benefit. *Ante,* at 11. But in this area of law, a decision to treat entities differently based on distinctions that the Religion Clauses make relevant does not amount to discrimination.[12] To understand why, keep

--------

[12] This explains, perhaps, the Court's reference to an Equal Protection Clause precedent, rather than a Free Exercise Clause precedent, for this point. See *ante,* at 11 (citing *Northeastern Fla. Chapter, Associated*

in mind that "the Court has unambiguously concluded that the individual freedom of conscience protected by the First Amendment embraces the right to select any religious faith or none at all." *Wallace* v. *Jaffree*, 472 U. S. 38, 52–53 (1985). If the denial of a benefit others may receive is discrimination that violates the Free Exercise Clause, then the accommodations of religious entities we have approved would violate the free exercise rights of nonreligious entities. We have, with good reason, rejected that idea, see, *e.g., Amos*, 483 U. S., at 338–339, and instead focused on whether the government has provided a good enough reason, based in the values the Religion Clauses protect, for its decision.[13]

The Court offers no real reason for rejecting the balancing approach in our precedents in favor of strict scrutiny, beyond its references to discrimination. The Court's desire to avoid what it views as discrimination is understandable. But in this context, the description is particularly

——————

*Gen. Contractors of America* v. *Jacksonville*, 508 U. S. 656 (1993)).

[13] No surprise then that, despite the Court's protests to the contrary, no case has applied its rigid rule. *McDaniel* v. *Paty*, 435 U. S. 618 (1978), on which the Court relies most heavily, mentioned "status" only to distinguish laws that deprived a person "of a civil right solely because of their religious beliefs." *Id.,* at 626–627 (plurality opinion). In *Torcaso* v. *Watkins*, 367 U. S. 488 (1961), the Court invalidated a law that barred persons who refused to state their belief in God from public office without "evaluat[ing] the interests assertedly justifying it." *McDaniel*, 435 U. S., at 626 (plurality opinion). That approach did not control in *McDaniel*, which involved a state constitutional provision that barred ministers from serving as legislators, because "ministerial status" was defined "in terms of conduct and activity," not "belief." *Id.,* at 627. The Court thus asked whether the "anti-establishment interests" the State offered were strong enough to justify the denial of a constitutional right—to serve in public office—and concluded that they were not. *Id.,* at 627–629. Other references to "status" in our cases simply recount *McDaniel*. See, *e.g., Church of Lukumi Babalu Aye, Inc.* v. *Hialeah*, 508 U. S. 520, 533 (1993); *Employment Div., Dept. of Human Resources of Ore.* v. *Smith*, 494 U. S. 872, 877 (1990).

inappropriate. A State's decision not to fund houses of worship does not disfavor religion; rather, it represents a valid choice to remain secular in the face of serious establishment and free exercise concerns. That does not make the State "atheistic or antireligious." *County of Allegheny* v. *American Civil Liberties Union, Greater Pittsburgh Chapter*, 492 U. S. 573, 610 (1989). It means only that the State has "establishe[d] neither atheism nor religion as its official creed." *Ibid.* The Court's conclusion "that the only alternative to governmental support of religion is governmental hostility to it represents a giant step backward in our Religion Clause jurisprudence." *Id.*, at 652, n. 11 (Stevens, J., concurring in part and dissenting in part).

At bottom, the Court creates the following rule today: The government may draw lines on the basis of religious status to grant a benefit to religious persons or entities but it may not draw lines on that basis when doing so would further the interests the Religion Clauses protect in other ways. Nothing supports this lopsided outcome. Not the Religion Clauses, as they protect establishment and free exercise interests in the same constitutional breath, neither privileged over the other. Not precedent, since we have repeatedly explained that the Clauses protect not religion but "the individual's freedom of conscience," *Jaffree*, 472 U. S., at 50—that which allows him to choose religion, reject it, or remain undecided. And not reason, because as this case shows, the same interests served by lifting government-imposed burdens on certain religious entities may sometimes be equally served by denying government-provided benefits to certain religious entities. Cf. *Walz*, 397 U. S., at 674 (entanglement); *Amos*, 483 U. S., at 336 (influence on religious activities).

JUSTICE BREYER's concurrence offers a narrower rule that would limit the effects of today's decision, but that rule does not resolve this case. JUSTICE BREYER, like the Court, thinks that "denying a generally available benefit

solely on account of religious identity imposes a penalty on the free exercise of religion that can be justified only by a state interest of the highest order," *ante,* at 6 (majority opinion) (internal quotation marks omitted). See *ante,* at 1–2 (BREYER, J., concurring in judgment). Few would disagree with a literal interpretation of this statement. To fence out religious persons or entities from a truly generally available public benefit—one provided to all, no questions asked, such as police or fire protections—would violate the Free Exercise Clause. Accord, *Rosenberger*, 515 U. S., at 879, n. 5 (Souter, J., dissenting). This explains why Missouri does not apply its constitutional provision in that manner. See Tr. of Oral Arg. 35–36. Nor has it done so here. The Scrap Tire Program offers not a generally available benefit but a selective benefit for a few recipients each year. In this context, the comparison to truly generally available benefits is inapt. Cf. *Everson*, 330 U. S., at 61, n. 56 (Rutledge, J., dissenting) (The Religion Clauses "forbi[d] support, not protection from interference or destruction").

On top of all of this, the Court's application of its new rule here is mistaken. In concluding that Missouri's Article I, §7, cannot withstand strict scrutiny, the Court describes Missouri's interest as a mere "policy preference for skating as far as possible from religious establishment concerns." *Ante,* at 14. The constitutional provisions of thirty-nine States—all but invalidated today—the weighty interests they protect, and the history they draw on deserve more than this judicial brush aside.[14]

---

[14] In the end, the soundness of today's decision may matter less than what it might enable tomorrow. The principle it establishes can be manipulated to call for a similar fate for lines drawn on the basis of religious use. See *ante*, at 1–3 (GORSUCH, J., concurring in part); see also *ante*, at 1–2 (THOMAS, J., concurring in part) (going further and suggesting that lines drawn on the basis of religious status amount to *per se* unconstitutional discrimination on the basis of religious belief).

Today's decision discounts centuries of history and jeopardizes the government's ability to remain secular. Just three years ago, this Court claimed to understand that, in this area of law, to "sweep away what has so long been settled would create new controversy and begin anew the very divisions along religious lines that the Establishment Clause seeks to prevent." *Town of Greece* v. *Galloway*, 572 U. S. ___, ___ (2014) (slip op., at 8). It makes clear today that this principle applies only when preference suits.

### IV

The Religion Clauses of the First Amendment contain a promise from our government and a backstop that disables our government from breaking it. The Free Exercise Clause extends the promise. We each retain our inalienable right to "the free exercise" of religion, to choose for ourselves whether to believe and how to worship. And the Establishment Clause erects the backstop. Government cannot, through the enactment of a "law respecting an establishment of religion," start us down the path to the past, when this right was routinely abridged.

The Court today dismantles a core protection for religious freedom provided in these Clauses. It holds not just that a government may support houses of worship with taxpayer funds, but that—at least in this case and perhaps in others, see *ante* at 14, n. 3—it must do so whenever it decides to create a funding program. History shows that the Religion Clauses separate the public treasury

--------

It is enough for today to explain why the Court's decision is wrong. The error of the concurrences' hoped-for decisions can be left for tomorrow. See, for now, *School Dist. of Abington Township* v. *Schempp*, 374 U. S. 203, 226 (1963) ("While the Free Exercise Clause clearly prohibits the use of state action to deny the rights of free exercise to *anyone*, it has never meant that a majority could use the machinery of the State to practice its beliefs").

SOTOMAYOR, J., dissenting

from religious coffers as one measure to secure the kind of freedom of conscience that benefits both religion and government.  If this separation means anything, it means that the government cannot, or at the very least need not, tax its citizens and turn that money over to houses of worship.  The Court today blinds itself to the outcome this history requires and leads us instead to a place where separation of church and state is a constitutional slogan, not a constitutional commitment.  I dissent.