**PUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

---

**No. 25-1574**

---

BETHANY M. HALL,

Plaintiff - Appellant,

v.

A. SCOTT FLEMING,

Defendant - Appellee.

---

Appeal from the United States District Court for the Eastern District of Virginia, at Richmond.  David J. Novak, District Judge.  (3:25-cv-00186-DJN)

---

Argued:  December 10, 2025                          Decided:  May 13, 2026

---

Before AGEE, RICHARDSON, and BENJAMIN, Circuit Judges.

---

Affirmed by published opinion.  Judge Benjamin wrote the opinion, in which Judge Agee and Judge Richardson joined.  Judge Richardson wrote a concurring opinion.

---

**ARGUED:**  Steven W. Fitschen, THE NATIONAL LEGAL FOUNDATION, for Appellant.  Christopher Praeger Bernhardt, OFFICE OF THE ATTORNEY GENERAL OF VIRGINIA, for Appellee.  **ON BRIEF:**  James A. Davids, THE NATIONAL LEGAL FOUNDATION, and Frederick W. Claybrook, Jr., CLAYBROOK LLC, for Appellant.  Jason S. Miyares, Thomas J. Sanford, and Jacqueline C. Hedblom, OFFICE OF THE ATTORNEY GENERAL OF VIRGINIA, for Appellee.

DEANDREA GIST BENJAMIN, Circuit Judge:

Bethany M. Hall sued A. Scott Fleming, in his official capacity as director of the State Council of Higher Education for Virginia ("SCHEV"), under 42 U.S.C. § 1983 for violating her free exercise rights under the First Amendment of the United States Constitution. The district court granted Fleming's motion to dismiss with prejudice. We affirm the district court's dismissal.

I.

Hall is a full-time undergraduate student at Liberty University who recently completed her sophomore year. Before Hall started at Liberty, she applied for the Virginia Tuition Assistance Grant Program ("VTAG Program").

The VTAG Program[1] provides financial assistance to Virginia residents who choose to attend accredited, private, nonprofit colleges and universities in Virginia. To be eligible for the VTAG Program, students must be "obligated to pay tuition as full-time . . . students at an eligible institution."[2] Va. Code Ann. § 23.1-631 (2016). Eligible students can receive a grant worth $5,000 per school year.

---

[1] SCHEV is responsible for administering the VTAG Program. Fleming, as the director of SCHEV, is responsible for its operations.

[2] Students enrolled at religious colleges and universities in Virginia, such as Liberty University, Regent University, and Eastern Mennonite University, are eligible to participate in the VTAG Program. J.A. 9; *see also Virginia Tuition Assistance Grant Program*, STATE COUNCIL OF HIGHER EDUC. FOR VA., SCHEV.EDU, [perma.cc/KRH4-SQZT].

2

At issue here, the VTAG Program limits eligibility to "nonprofit private institutions of higher education whose primary purpose is to provide collegiate, graduate, or professional education *and not provide religious training or theological education*."  Va. Code Ann. § 23.1-628 (2016) (emphasis added).  SCHEV's regulations for the VTAG Program provide that undergraduate "[p]rograms that provide religious training or theological education, classified as CIP Code 39-series programs, are not eligible programs."  8 Va. Admin. Code § 40-71-10 (2022).  "CIP" stands for "Classification of Instructional Programs," which are published by the National Center for Educational Statistics.  CIP Code 39 is an extensive list of majors that "prepare individuals for the professional practice of religious vocations."[3]  Simply put, a student majoring in a program listed in CIP Code 39 is ineligible for the VTAG program.  However, the VTAG Program does have *some* flexibility.  Students pursuing a double major that includes both an eligible major and a CIP Code 39 major remain eligible for the VTAG Program, provided that, in any given semester, they do not enroll in more credits for the ineligible major than for the eligible major.  *See* 8 Va. Admin. Code § 40-71-10 (2022).

In February 2023, Liberty's financial aid office informed Hall that she was eligible to receive $5,000 through the VTAG Program for the 2023–2024 academic year.  She began at Liberty that fall, majoring in "Music Education: Choral."  But soon after, Hall "heard God's call to ministry and changed her major to 'Youth Ministries,' " a CIP Code

---

[3] *Detail for CIP Code 39*, Nat'l Ctr. For Educ. Statistics, NCES.ED.GOV, [https://perma.cc/BD4R-HTPY].

39 major. *See* Appellant's Br. (ECF No. 12) at 2–3[4] (hereinafter "Opening Br.") (citing J.A. 11–12).[5] Liberty's financial aid office subsequently informed Hall that given her change of major, she was ineligible to receive a grant through the VTAG Program. Hall then sought to change her major again, this time to "Music & Worship." But "Music & Worship" was also a CIP Code 39 major. Liberty informed Hall that her "Music & Worship" major was also ineligible for the VTAG Program. Hall did not receive a grant through the VTAG Program for the 2023–2024 and 2024–2025 academic years.

Hall sued Fleming in federal district court. *Hall v. Fleming*, No. 3:25-CV-186-DJN, 2025 WL 2021022 (E.D. Va. May 9, 2025). She asserted a single claim, alleging that the VTAG Program violated her free exercise rights under the First Amendment. *Id.* at *1. Fleming moved to dismiss on the grounds that the Supreme Court's decision in *Locke v. Davey*, 540 U.S. 712 (2004), controlled and thus foreclosed Hall's claim. *Id.* at *3. Hall conceded that "her situation aligns with the one faced by the undergraduate student pursuing a religious vocation major in *Locke*." *Id.* But Hall contended that the Supreme Court in *Trinity Lutheran Church of Columbia, Inc. v. Comer*, 582 U.S. 449 (2017), *Espinoza v. Montana Department of Revenue*, 591 U.S. 464 (2020), and *Carson ex rel.*

---

[4] Page numbers for citations to ECF documents utilize the page numbers in the red header on each document.

[5] Citations to "J.A." refer to the joint appendix filed by the parties. The J.A. contains the record on appeal from the district court. Page numbers for citations to the J.A. utilize the "JA#" numbering at the bottom of the page on each document.

4

*O.C. v. Makin*, 596 U.S. 767 (2022), "effectively abrogated and overruled *Locke*," and thus "*Locke* should now be explicitly overruled." *Hall*, 2025 WL 2021022, at *2.

The district court disagreed. It found that Hall's claim was directly analogous to the plaintiff's in *Locke*. *Id.* at *3. Further, the district court found that contrary to Hall's "assertion that the Supreme Court's subsequent Free Exercise decisions effectively abrogated and overruled *Locke*, these cases instead reaffirm *Locke*'s holding and support its application to the instant case." *Id.* (internal citations omitted). Accordingly, the district court dismissed Hall's case with prejudice. *Id.* at *5.

Hall now appeals, asserting the same arguments. We have jurisdiction pursuant to 28 U.S.C. § 1291, as this is an appeal of a final decision from the United States District Court for the Eastern District of Virginia.

## II.

"We review a district court's grant of a motion to dismiss de novo." *Ray v. Roane*, 948 F.3d 222, 226 (4th Cir. 2020) (citing *King v. Rubenstein*, 825 F.3d 206, 214 (4th Cir. 2016)).

### A.

The Religion Clauses of the First Amendment provide that "Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof." U.S. CONST. amend I.

*Locke* is a seminal Supreme Court case on the relationship between the Free Exercise Clause of the First Amendment and state educational scholarship programs like

the VTAG Program. There, the state of Washington established a scholarship program to assist academically gifted students with college expenses. 540 U.S. at 715. The scholarship was not to "be awarded to any student who is pursuing a degree in theology." *Id.* at 716 (citing Wash. Rev. Code. Ann. § 26B.10.814 (West 1997)). Joshua Davey was a scholarship recipient and attended Northwest College. *Id.* at 717. He "decided to pursue a double major in pastoral ministries and business management/administration," but was informed by Northwest College that he could not use the scholarship for his theology degree. *Id.* Davey sued, asserting that the Washington statute violated his free exercise rights. *Id.* at 718.

The Supreme Court held that Washington's scholarship program did not violate the Free Exercise Clause. *Id.* at 715. The Supreme Court reasoned that Washington's law did not deny Davey the right to "participate in the political affairs of the community," or "require students to choose between their religious beliefs and receiving a government benefit." *Id.* at 720–21. The state "merely chose[] not to fund a distinct category of instruction." *Id.* at 721. Further, the scholarship program permitted students to receive and use public funds to attend religious schools and take devotional theology courses. *Id.* at 724–25. But "majoring in devotional theology is akin to a religious calling." *Id.* at 721. And importantly, the Supreme Court held that the Washington statute was supported by the "historic and substantial state interest" "against procuring taxpayer funds to support church leaders, which was one of the hallmarks of an 'established religion.' " *Id.* at 725, 722.

B.

6

The Supreme Court's decision in *Locke* is directly analogous to this case. Hall even concedes that the facts here "are on all fours [or identical]" with *Locke*. Reply Br. (ECF No. 19) at 1. Both Hall and Davey chose to pursue a major in a religious vocation at a private religious college. Both state statutes allow students to take religious courses if the funding does not go toward an ineligible major. *See* 8 Va. Admin. Code § 40-71-10 (2022); s*ee also Locke*, 540 U.S. at 724–25.[6] Both Hall's and Davey's choice of majors rendered them ineligible for a tuition grant. And both Hall and Davey sued, contending that their respective state laws barring tuition assistance for students pursuing religious vocational majors violated the Free Exercise Clause. So the only question before us is whether the Supreme Court in *Trinity Lutheran*, *Espinoza*, and *Carson* abrogated *Locke*, as Hall says, "into oblivion." Reply Br. at 1. They did not.

1.

In *Trinity Lutheran*, the Missouri Department of Natural Resources offered grants to public and private schools for the purchase of rubber playground surfaces. 582 U.S. 449, 453 (2017). Trinity Lutheran Church applied for the grant for its preschool daycare center but was denied. *Id.* at 453–54. The department had a policy that "categorically disqualif[ied] churches and other religious organizations from receiving grants under its playground resurfacing program." *Id.* at 454. The Supreme Court held that this policy violated Trinity Lutheran Church's free exercise rights because it "expressly

---

[6] Eligibility criteria for the VTAG Program is actually broader than the Washington statute in *Locke*. The VTAG Program grant can extend to students pursuing a double major that includes an ineligible CIP Code 39 major. *See* 8 Va. Admin. Code § 40-71-10 (2022).

discriminate[d] against otherwise eligible recipients by disqualifying them from a public benefit solely because of their religious character." *Id.* at 462. The "policy put[] Trinity Lutheran to a choice: It may participate in an otherwise available benefit program or remain a religious institution." *Id.* The simple rule was that "[n]o churches need apply." *Id.* at 465.

*Locke* came under the spotlight in *Trinity Lutheran*. The department argued that the free exercise question was controlled by *Locke*. *Id.* at 464. However, the Supreme Court held that Washington's restriction on the use of scholarship funds in *Locke* was fundamentally different from Missouri denying Trinity Lutheran Church a grant solely because it was a church. *See id.* at 464–65. It explained that Washington had "merely chosen not to fund a distinct category of instruction." *Id.* at 464 (quoting *Locke*, 540 U.S. at 721). Further, while "scholarship recipients were free to use the money at accredited religious and non-religious schools alike, they were not permitted to use the funds to pursue a devotional theology degree—one 'devotional in nature or designed to induce religious faith.' " *Id.* at 464 (quoting *Locke*, 540 U.S. at 716). The Supreme Court also emphasized "Washington's choice . . . in keeping with the State's antiestablishment interest in not using taxpayer funds to pay for the training of clergy." *Id.* at 465. And while "opposition to such funding to support church leaders lay at the historic core of the Religion Clauses," nothing of the sort could "be said about a program to use recycled tires to resurface playgrounds." *Id.* (cleaned up). Accordingly, *Trinity Lutheran* did not abrogate or overrule *Locke*; it instead reaffirmed *Locke*'s holding.

8

The Supreme Court reaffirmed *Locke* again in *Espinoza*. In *Espinoza*, the Montana legislature established a program to provide tuition assistance to parents that were enrolling their children in private schools. 591 U.S. at 467–68. Three mothers sought to use the tuition assistance scholarships at a religious school, but Montana's "Rule 1" prohibited families from using those scholarships at religious schools. *Id.* at 470–71. The Supreme Court held that, like Missouri's law in *Trinity Lutheran*, Montana's law "bar[red] religious schools from public benefits solely because of the religious character of the schools." *Id.* at 476. *Espinoza* "turn[ed] expressly on religious status and not religious use." *Id*. at 477.

Importantly (and like in *Trinity Lutheran*), the Supreme Court in *Espinoza* also found that *Locke* differed in a few key ways. *See id.* at 479–83. First, the *Locke* plaintiff was denied a scholarship because he proposed to use funds to prepare for the ministry; Montana instead sought to "bar[] all aid to a religious school 'simply because of what it is,' putting the school to a choice between being religious or receiving government benefits." *Id*. at 479–80 (citing *Trinity Lutheran*, 582 U.S. at 464). Second, *Espinoza* reiterated the "historic and substantial" state interest in *Locke* to not fund the training of clergy, which was not present in Montana's decision to disqualify religious schools from government aid. *Id.* at 480 (citing *Locke*, 540 U.S. at 725). Accordingly, *Espinoza* does not "explain[] why *Locke* should have no application to free exercise claims," as Hall suggests. Reply Br. at 4. It did the contrary.

The Supreme Court did not veer in *Carson*, its latest decision on free exercise rights and educational funding. There, Maine enacted a tuition assistance program for parents who lived in school districts that did not operate a secondary school of their own. 596 U.S.

9

at 771–72.  Pursuant to the program, parents could designate a public or private secondary school that they would like their child to attend.  *Id.* at 772.  The school district would then transmit payments to that school to help defray the costs of tuition.  *Id.*  However, the relevant Maine statute rendered all "sectarian" private schools ineligible.  *See id.* at 774–75.  Two Maine families sued the Maine Department of Education, alleging that the "nonsectarian" requirement of Maine's tuition assistance program violated the First Amendment. *Id.* at 776.  The Supreme Court held that Maine's "nonsectarian" requirement violated the First Amendment.  It explained that "[t]he 'unremarkable' principles applied in *Trinity Lutheran* and *Espinoza* suffice to resolve this case." *Id.* at 780.

The effects of the state laws challenged in *Trinity Lutheran*, *Espinoza*, and *Carson* were the same—to disqualify a religious organization or school from a generally available benefit, solely because of their religious character.  *See id.*  Like in *Trinity Lutheran* and *Espinoza*, the Supreme Court in *Carson* again emphasized how *Locke* was different and could "be of no help to Maine." *Id.* at 788.  The funding in *Locke* was intended to be used "to prepare for the ministry," but it could still be used for theology courses—"only a 'vocational religious' *degree* was excluded." *Id.* (citing *Trinity Lutheran*, 582 U.S. at 464).  And for the third time, the Supreme Court emphasized "the 'historic and substantial state interest' [in *Locke*] against using 'taxpayer funds to support church leaders' " that was not present in *Trinity Lutheran*, *Espinoza*, or *Carson*. *Id.* (citing *Locke*, 540 U.S. at 722).

Based on the foregoing, we disagree with Hall and hold that the Supreme Court has yet to either overrule or abandon its decision in *Locke* through *Trinity Lutheran*, *Espinoza*, or *Carson*.

10

2.

In opposition to the straightforward analysis above, Hall contends that her current position should be analogized to the Supreme Court's treatment of the *Lemon* test. *See* Opening Br. at 15–16. We disagree.

In *Lemon v. Kurtzman*, 403 U.S. 602, 612–13 (1971), the Supreme Court attempted a "grand unified theory" for assessing Establishment Clause claims that required "an examination of the law's purposes, effects, and potential entanglement with religion." *Kennedy v. Bremerton Sch. Dist.*, 597 U.S. 507, 534 (2022) (citing *Am. Legion v. Am. Humanist Ass'n*, 588 U.S. 29, 60 (2019)). Yet, the Supreme Court in later opinions "either expressly declined to apply the [*Lemon*] test or [] simply ignored it." *Am. Legion*, 588 U.S. at 49 (2019) (collecting cases). In *American Legion*, the Supreme Court explicitly stated that "[w]hile the *Lemon* Court ambitiously attempted to find a grand unified theory of the Establishment Clause, in later cases, we have taken a more modest approach." *Id.* at 60. And ultimately in *Kennedy*, the Supreme Court noted that it "long ago abandoned *Lemon*." 597 U.S. 507, 534 (2022).

Unlike the *Lemon* test, nowhere in *Trinity Lutheran*, *Espinoza*, or *Carson* did the Supreme Court make such explicit statements rejecting *Locke*'s holding. And as a lower court, we must "follow the case which directly controls, leaving to [the Supreme] Court the prerogative of overruling its own decisions." *Rodriguez de Quijas v. Shearson/Am. Express, Inc.*, 490 U.S. 477, 484 (1989). So, in the absence of any statement from the Supreme Court questioning or rejecting *Locke*'s holding, it is still the law. We must therefore faithfully apply it.

11

III.

Accordingly, the district court's dismissal is

*AFFIRMED.*

RICHARDSON, Circuit Judge, concurring:

I concur because *Locke v. Davey*, 540 U.S. 712 (2004), controls here. I write separately because *Locke* was wrongly decided. It betrays the founding generation's commitment to religious liberty, and the Supreme Court should formally overrule it. But, until the Court does, *Locke* binds us—even as a moth-eaten shell of its former self.

## I.    THE SUPREME COURT SHOULD FORMALLY OVERRULE *LOCKE V. DAVEY*

Like Washington's scholarship program in *Locke*, Virginia's Tuition Assistance Grant Program facially discriminates "against a religious minority"—"those whose belief in their religion is so strong that they dedicate their study and their lives to its ministry." *Locke*, 540 U.S. at 733 (Scalia, J., dissenting). Yet *Locke* held that this discrimination against students pursuing ministerial degrees did not violate the Free Exercise Clause. That holding rested on bad history and bad reasoning.[1]

*Locke* recited the history of "popular uprisings against procuring taxpayer funds to support church leaders" as one justification for its decision. *Locke*, 540 U.S. at 722. Justice Scalia debunked that account in dissent, explaining that the "history involved not the inclusion of religious ministers in public benefit programs like the one at issue here, but laws that singled them out for financial aid." *Id.* at 727.[2] And while "[o]ne can concede

---

[1] Even a great Chief Justice can err.

[2] For example, the *Locke* majority pointed to James Madison's famous *Memorial and Remonstrance* as evidence of the Framers' disapproval of "state-supported clergy." 540 U.S. at 722. Madison's *Remonstrance* attacked a proposed Virginia tax, titled "A Bill Establishing a Provision for Teachers of the Christian Religion," the proceeds of which (Continued)

the Framers' hostility to funding the clergy *specifically*, . . . that says nothing about whether the clergy had to be excluded from benefits the State made available to all." *Id.* at 727 (Scalia, J., dissenting). The difference between giving ministers special treatment and including them in programs available to everyone is one of kind, not degree. Founding-era opposition to special funding does not provide a historical basis for carving religion out of generally available benefits. *Cf. N.Y. State Rifle & Pistol Ass'n, Inc. v. Bruen*, 597 U.S. 1, 47 (2022). Nor does history reveal any Founding-era practice of excluding clergy (or clergy in training) from generally available benefits. *See* Berg & Laycock, *Mistakes in Locke*, *supra*, at 244, 244 n.113; *Locke*, 540 U.S. at 727–28 (Scalia, J., dissenting) ("No one would seriously contend . . . that the Framers would have barred ministers from using public roads on their way to church.").

*Locke* compounded its historical error by misapplying precedent. The outcome of *Locke* should have been controlled by *Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520 (1993), as Justice Scalia laid out in dissent. Washington's program was not "neutral" because it "discriminate[d] against religion as such." *Locke*, 540 U.S. at

---

would directly support Christian teachers and ministers. *See* James Madison, *Memorial and Remonstrance Against Religious Assessments* (1785), *and* A Bill Establishing a Provision for Teachers of the Christian Religion (1784), *both reprinted in Everson v. Bd. of Educ.*, 330 U.S. 1, 63–74 (1947) (appendices to dissent of Rutledge, J.). The bill "was a massive discrimination in favor of religious viewpoints," not a neutral program that only incidentally benefitted religion. Thomas C. Berg & Douglas Laycock, *The Mistakes in* Locke v. Davey *and the Future of State Payments for Services Provided by Religious Institutions*, 40 Tulsa L. Rev. 227, 242 (2004). And Madison criticized the bill as unequal, "not because it allowed religious groups to participate in a generally available government program, but because the bill singled out religious entities for special benefits." *Rosenberger v. Rector & Visitors of Univ. of Va.*, 515 U.S. 819, 854–55 (1995) (Thomas, J., concurring).

726 (Scalia, J., dissenting) (quoting *Lukumi*, 508 U.S. at 579 (Blackmun, J., concurring in the judgment)).  Under *Lukumi*, "[a] law burdening religious practice that is not neutral . . . must undergo the most rigorous of scrutiny."  508 U.S. at 546; *see id.* ("A law that targets religious conduct for distinctive treatment or advances legitimate governmental interests only against conduct with a religious motivation will survive strict scrutiny only in rare cases.").  But the *Locke* court refused to apply *Lukumi* and resolved the case without applying any particular level of scrutiny.  540 U.S. at 720–25.

Over the past decade, the Supreme Court has eroded *Locke*'s foundation.  *See Trinity Lutheran Church of Columbia, Inc. v. Comer*, 582 U.S. 449, 464 (2017); *Espinoza v. Mont. Dep't of Revenue*, 591 U.S. 464, 479–80 (2020); *Carson v. Makin*, 596 U.S. 767, 786–89 (2022).  *Carson* makes the point.  There, the Supreme Court held that discrimination based on religious status and discrimination based on religious use are equally "offensive to the Free Exercise Clause."  *Id.* at 787.  In so holding, it cabined *Locke* to its facts: "*Locke* cannot be read beyond its narrow focus on vocational religious degrees."  *Id.* at 789.  At this point, the Supreme Court has rejected or ignored every premise of *Locke* except its flawed historical analysis.[3]

_____

[3] For example, the *Locke* majority dismissed Washington's religious discrimination as "mild[]," and therefore not violative of the Free Exercise Clause.  540 U.S. at 720.  In dissent, Justice Scalia wrote:  "The indignity of being singled out for special burdens on the basis of one's religious calling is so profound that the concrete harm produced can never be dismissed as insubstantial."  *Id.* at 731.  Today, the Supreme Court sounds more like Scalia's dissent, making statements like "[t]he loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury."  *Roman Catholic Diocese of Brooklyn v. Cuomo*, 592 U.S. 14, 19 (2020) (per curiam) (quoting *Elrod v. Burns*, 427 U.S. 347, 373 (1976) (plurality opinion)).  Similarly, the Supreme (Continued)

15

*Locke* was an outlier when decided. And it is even more of one today. Absent *Locke*, the Court's more recent decisions in *Trinity Lutheran*, *Espinoza*, and *Carson* would require us to hold that Virginia's program violates the Free Exercise Clause. But we are not yet free to ignore *Locke*.

## II.    THIS COURT CANNOT TREAT *LOCKE* AS IMPLICITLY OVERRULED

This case is materially indistinguishable from *Locke*. And, absent more guidance from the Supreme Court, we may not declare *Locke* implicitly abrogated here.

I have observed that the Supreme Court has "recently suggested that a case need not be expressly overruled when the Court has given every indication that the case has been abandoned." *Planned Parenthood S. Atl. v. Kerr*, 95 F.4th 152, 170 n.2 (4th Cir. 2024) (Richardson, J., concurring); *see Medina v. Planned Parenthood S. Atl.*, 606 U.S. 357, 377 (2025); *Kennedy v. Bremerton Sch. Dist.*, 597 U.S. 507, 534 (2022). *Locke* may be next.[4] It fits the Supreme Court's pattern of whittling away at cases before recognizing them as abrogated. *See* Curtis Bradley & Tara Leigh Grove, *Disfavored Supreme Court Precedent in the Lower Federal Courts*, 111 Va. L. Rev. 1353, 1355–56 (2025).

---

Court has rejected the notion of "play in the joints" between the Free Exercise and Establishment Clauses—a notion on which the *Locke* majority heavily relied. *See, e.g.*, *Kennedy v. Bremerton Sch. Dist.*, 597 U.S. 507, 533 (2022) ("A natural reading [of the First Amendment] would seem to suggest the [religion] Clauses have 'complementary' purposes, not warring ones."); *Espinoza*, 591 U.S. at 484–85 ("[A state's] interest in separating church and State 'more fiercely' than the Federal Constitution . . . 'cannot qualify as compelling' in the face of the infringement of free exercise." (quoting *Trinity Lutheran*, 582 U.S. at 466) (cleaned up)).

[4] *See* Frederick Claybrook, *Is* Locke *the Next Supreme Court Decision the Lower Courts Should Ignore?*, Federalist Society Blog (July 2, 2025).

But even if *Locke* is next, what are lower courts to do? Should we read *Kennedy* and *Medina* as an invitation to treat disfavored precedents as implicitly overruled? That is hard to square with the command that "[i]f a precedent of [the Supreme] Court has direct application in a case, yet appears to rest on reasons rejected in some other line of decisions, the Court of Appeals should follow the case which directly controls, leaving to [the Supreme] Court the prerogative of overruling its own decisions." *Rodriguez de Quijas v. Shearson/Am. Exp., Inc.*, 490 U.S. 477, 484 (1989); *see also Agostini v. Felton*, 521 U.S. 203, 237 (1997); *Mallory v. Norfolk S. Ry. Co.*, 600 U.S. 122, 136 (2023). So "it remains unclear whether recognizing abandonment remains solely within the prerogative of the Supreme Court." *Kerr*, 95 F.4th at 170 n.2 (Richardson, J., concurring).[5]

But lower courts should not treat uncertainty as license to ignore binding precedent. "Vertical stare decisis is an inflexible rule that admits of no exception." Amy Coney Barrett, *Precedent and Jurisprudential Disagreement*, 91 Tex. L. Rev. 1711, 1712 (2013). In our hierarchical system, "lower courts cannot *alter or overrule* [the Supreme] Court's precedents." *Trump v. Boyle*, 145 S. Ct. 2653, 2655 (2025) (Kavanaugh, J., concurring) (emphasis added); *see also Nat'l Insts. of Health v. Am. Pub. Health Ass'n*, 145 S. Ct. 2658,

---

[5] One could also consider this issue by analogizing the overturning of a Supreme Court case with murder. The "murderer" kills the case. And the Supreme Court is the only acceptable murderer in our system of strict vertical stare decisis. Yet the murderer is different from the coroner. The coroner declares the case dead. The question in light of *Kennedy* and *Medina* is not whether lower courts can be murderers—they obviously can't. Instead, the question is whether the Supreme Court is the sole coroner, or whether lower courts may sometimes assume that role. If they can, it raises more questions. When may lower courts assume the coroner role? How should they perform that role? What signals from the Supreme Court reveal that a precedent is a dead letter?

2663 (2025) (Gorsuch, J., concurring in part and dissenting in part). One could imagine a different system,[6] but that doesn't change the one we have. As of today, the Supreme Court has not told us that *Locke* is no longer law. True, the Court has narrowed *Locke*[7] to the point that I would not extend it to any novel setting. But even in that narrowed form, *Locke* "directly controls" this case. *Rodriguez de Quijas*, 490 U.S. at 484. So until the Supreme Court tells us to start reading tea leaves, I will not.

\*       \*       \*

*Locke v. Davey* is a stain on our Free Exercise jurisprudence. And the Supreme Court has all but confined it to its facts. But until the Court formally buries *Locke*, we lower-court judges must keep applying it.

---

[6] Before *Rodriguez de Quijas*, whether and to what extent lower courts should follow disfavored precedent was "vigorously debated." C. Steven Bradford, *Following Dead Precedent: The Supreme Court's Ill-Advised Rejection of Anticipatory Overruling*, 59 Fordham L. Rev. 39, 43 (1990). And scholars continue to disagree about whether *Rodriguez de Quijas* took the correct approach. *Compare* Bradley Scott Shannon, *Overruled by Implication*, 33 Seattle U. L. Rev. 151 (2009), *and* A. Christopher Bryant & Kimberly Breedon, *How the Prohibition on "Under-Ruling" Distorts the Judicial Function (and What To Do About It)*, 45 Pepperdine L. Rev. 505 (2018), *with* Bradley & Grove, *Disfavored Precedent*, *supra*.

[7] Professors Bradley and Grove identify five ways the Supreme Court disfavors its own precedent: "(1) disparaging statements in subsequent opinions; (2) decisions that distinguish or narrow an earlier decision; (3) failure to cite a precedent; (4) decisions in related areas that seem inconsistent with the earlier precedent; and (5) methodological shifts that seem to undermine the foundations of a precedent." Bradley & Grove, *Disfavored Precedent*, *supra* at 1359. Under their proposed approach to disfavored precedent, vertical stare decisis permits lower courts to "rely *only* on the first and second categories, and *only* to the extent that the Supreme Court has criticized, distinguished, or narrowed its precedent in binding decisions." *Id.* But even using this approach, *Locke* would control here. The Supreme Court's binding decisions have not directly disparaged *Locke* but narrowed it. That narrowing tells us to cease applying *Locke* in many contexts but to continue applying *Locke* to the extent its narrowed reach still controls.

18